John Wesley **RALLS**

v.

**John R. MANSON, Commissioner of Corrections of the State of Connecticut.**

**Civ. No. H–205.**

United States District Court, D. Connecticut.

May 7, 1974.

Morton P. Cohen, David Golub (Martha Stone on the brief), West Hartford, Conn., for plaintiff.

Michael Dearington, Asst. State's Atty., New Haven, Conn., for defendant.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

Petitioner was convicted of murder in the second degree on November 17, 1970, after a jury trial in Connecticut Superior Court at New Haven. On December 11, 1970, he was sentenced to a term of life imprisonment. He is presently incarcerated at the Connecticut Correctional Institution at Somers. He seeks a writ of habeas corpus in this Court, claiming that his rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution were denied during his trial in state court. Before the merits of his substantive claims may be assessed, however, it must be determined whether 28 U.S.C. § 2254(b), which requires state prisoners to exhaust available state court remedies before applying for federal habeas corpus, bars this Court from considering petitioner's claims.

## I. EXHAUSTION OF STATE REMEDIES

### A. *Petitioner's Direct Appeal*

The chronology of the petitioner's direct appeal in the state courts is not in dispute. Petitioner's trial counsel, a Public Defender for New Haven County, was originally appointed to represent petitioner on appeal. On December 30, 1970, the Public Defender filed a notice of appeal of the petitioner's conviction in New Haven Superior Court.[1] On August 19, 1971,[2] the Public Defender filed a request for a finding and a draft finding,[3] as required by Sections 629 and 630 of the Connecticut Practice Book. The petitioner subsequently sought a change of counsel, and on October 28, 1971, the Public Defender was granted permission to withdraw as petitioner's appellate counsel and a Special Public Defender was appointed to represent the petitioner.[4] On November 15, 1971, the Special Public Defender moved for and received permission to file an amended draft finding.[5] On December 15, 1971, the Special Public Defender filed an amended draft finding, and on January 3, 1972, he filed an amended request for a finding.[6] Thereafter the State's Attorney moved for and received numerous extensions of time in which to file its draft counterfinding,[7] required by Section 631 of the Practice Book. The draft counterfinding was ultimately filed on January 5, 1973.[8] The trial judge filed his finding, required by Sections 634–635 of the Practice Book, on March 12, 1973.[9] Both the Special Pub-

---

1. Petitioner's Exhibit 4, "Notice of Appeal."

2. A portion of the transcript, containing the testimony at the trial, was completed on March 22, 1971, and sent to the Public Defender. The remainder of the transcript, containing the voir dire, was completed by June 16, 1971. Affidavit of Joan E. Pugliuco, court reporter for Superior Court at New Haven, dated January 24, 1974.

3. Petitioner's Exhibit 11, "Request For A Draft Finding."

4. *See* Petitioner's Exhibit 2(c), Superior Court Docket # 16334.

5. *Id.*

6. *Id.*

7. *See* Petitioner's Exhibit 2(c), (d), Superior Court Docket # 16334.

8. *See* Petitioner's Exhibit 2(e), Superior Court Docket # 16334.

9. *Id.*

lic Defender and the State's Attorney immediately moved to correct the trial judge's finding, pursuant to Section 636 of the Practice Book, and the trial judge filed a corrected finding on May 2, 1973.[10] The Special Public Defender filed assignments of error, required by Section 612 of the Practice Book, on May 29, 1973.[11] The record in the case finally went to the printer in June of 1973. The printed record was sent to the Connecticut Supreme Court and the parties on October 31, 1973.[12] An appendix to the record, which the Special Public Defender sent to the printer in July of 1973, is being printed at the present time.[13] Thus, almost three and one-half years after the petitioner's notice of appeal was filed, briefs have still not been printed or filed with the Connecticut Supreme Court, nor has a date been set for argument before the Connecticut Supreme Court on petitioner's direct appeal of his state court conviction.[14]

B. *Inordinate Delay and the Absence of Effective Available State Corrective Process Under 28 U.S.C. § 2254 (b)*

The Judicial Code, 28 U.S.C. § 2254, provides as follows:

"(b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner."

 This provision has generally been construed to foreclose issuance by a federal court of a writ of habeas corpus until the petitioner has presented his claims to the state courts and received a decision in his case:

"It has been settled since *Ex parte Royall,* 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886), that a state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus. . . . We have consistently adhered to this federal policy, for 'it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation.' *Darr v. Burford,* 339 U.S. 200, 204, 70 S.Ct. 587, 590, 94 L.Ed. 761 (1950) . . . ."

*Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971). As long as the petitioner fairly presents his claims to the state courts, it is of no consequence that the claims are dismissed for failure to comply with state procedural requirements: "The state courts need not have decided the merits of the claims raised by the applicant in the state courts in order for him to be considered to have exhausted his state court remedies." *United States ex rel. Meadows v. State of New York,* 426 F.2d 1176, 1179 n. 1 (2d Cir. 1970), cert. denied 401 U.S. 941, 91 S.Ct. 944, 28 L.Ed.2d 222 (1971). See *Hawkins v. Robinson,* 367 F.Supp. 1025, 1029 (D.Conn. 1973). However, the petitioner must have presented to the state courts the same claims which he subsequently urges upon the federal habeas court. *Picard v. Connor, supra,* 404 U.S. at 276.

 It is well established that the exhaustion requirement of 28 U.S.C. § 2254 is not jurisdictional: it does not restrict the *power* of the federal court to

---

10. *Id.*

11. *Id.*

12. Respondent's Exhibit 1.

13. *See* Affidavit of William J. Mack, president, William J. Mack Company, printing firm, dated January 25, 1974.

14. The Connecticut Supreme Court does not hear oral argument during July, August and September. Thus, the petitioner could not be heard on his direct appeal until some time during the October 1974 Term of the Connecticut Supreme Court, at the earliest.

grant relief in appropriate cases. Fay v. Noia, 372 U.S. 391, 420, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); United States ex rel. Graham v. Mancusi, 457 F.2d 463, 468 (2d Cir. 1972). Rather, the exhaustion requirement is grounded in flexible considerations of comity, "a doctrine which teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter," Darr v. Burford, 339 U.S. 200, 204, 70 S.Ct. 587, 590, 94 L.Ed. 761 (1950), quoted in Fay v. Noia, *supra*, 372 U.S. at 420. Indeed, the broad scope of federal habeas corpus indicates that federal courts must place primary emphasis on the redress of constitutional deprivations rather than on deference to the state judicial machinery: "Although in form the Great Writ is simply a mode of procedure, its history is inextricably intertwined with the growth of fundamental rights of personal liberty. For its function has been to provide a prompt and efficacious remedy for whatever society deems to be intolerable restraints. Its root principle is that in a civilized society, government must always be accountable to the judiciary for a man's imprisonment: if the imprisonment cannot be shown to conform with the fundamental requirements of law, the individual is entitled to his immediate release." Fay v. Noia, *supra*, 372 U.S. at 401–402. As the Supreme Court recently declared, in Hensley v. Municipal Court, 411 U.S. 345, 349–350, 93 S.Ct. 1571, 1574, 36 L.Ed.2d 294 (1973):

"While the 'rhetoric celebrating habeas corpus has changed little over the centuries,' it is nevertheless true that the functions of the writ have undergone dramatic change. Our recent decisions have reasoned from the premise that habeas corpus is not 'a static, narrow, formalistic remedy,' Jones v. Cunningham, *supra*, 371 U.S. 236 at 243 [83 S.Ct. 373, 9 L.Ed.2d 285] but one which must retain the 'ability to cut through barriers of form and procedural mazes.' Harris v. Nelson, 394 U.S. 286, 291 [, 89 S.Ct. 1082, 1086, 22 L.Ed.2d 281] (1969). See Frank v. Mangum, 237 U.S. 309, 346 [, 35 S.Ct. 582, 594, 59 L.Ed. 969] (1915) (Holmes, J., dissenting). 'The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected.' Harris v. Nelson, *supra*, 394 U.S. at 291 [89 S.Ct. at 1086].

Thus, we have consistently rejected interpretations of the habeas corpus statute that would suffocate the writ in stifling formalisms or hobble its effectiveness with the manacles of arcane and scholastic procedural requirements. The demand for speed, flexibility, and simplicity is clearly evident in our decisions concerning the exhaustion doctrine, Fay v. Noia, 372 U.S. 391 [83 S.Ct. 822, 9 L.Ed.2d 837] (1963); Brown v. Allen, 344 U.S. 443, [, 73 S.Ct. 397, 97 L.Ed. 469] (1953).
. . . ." (Footnote omitted).

Thus the exhaustion doctrine "is a judicially-crafted instrument which reflects a careful balance between important interests of federalism and the need to preserve the writ of habeas corpus as a 'swift and imperative remedy in all cases of illegal restraint or confinement.'" Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484, 490, 93 S.Ct. 1123, 1127, 35 L.Ed.2d 443 (1973). Accordingly, the Supreme Court has noted that "once the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied." Picard v. Connor, *supra*, 404 U.S. 270, 275 (1971). The exhaustion requirement

". . . does not erect insuperable or successive barriers to the invocation of federal habeas corpus. [It] is merely an accommodation of our federal system designed to give the State an initial 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights. Fay v.

Noia, 372 U.S. 391, 438 [83 S.Ct. 822, 848, 9 L.Ed.2d 837] (1963)."

Wilwording v. Swenson, 404 U.S. 249, 250, 92 S.Ct. 407, 408, 30 L.Ed.2d 418 (1971).

The federal Courts of Appeals have recognized that excessive delays in state court proceedings in which a defendant claims that his conviction was obtained in violation of his constitutional rights may deny the defendant due process of law and justify a federal court in proceeding to the merits of a habeas corpus petition. In the leading case, Smith v. State of Kansas, 356 F.2d 654 (10th Cir. 1966), cert. denied 389 U.S. 871, 88 S.Ct. 154, 19 L.Ed.2d 151 (1967), the petitioner had pleaded guilty in April, 1964, to state charges of second degree burglary and grand larceny. In September, 1964, claiming that his guilty plea had been coerced, Smith filed a motion for relief under the Kansas post-conviction statute. In March, 1965, the motion was denied. Smith filed a notice of appeal and the trial court appointed the same attorney to represent Smith on his appeal. Smith objected to the appointment of the attorney, and the attorney filed a motion to withdraw. While that motion was under consideration, Smith filed a petition for a writ of habeas corpus in federal district court. The petition was dismissed on the ground that Smith had failed to exhaust his pending state remedy. Smith then appealed the denial of federal habeas corpus, and in December, 1965, while his appeal was pending before the Court of Appeals for the Tenth Circuit, an order was filed in the state court sustaining the trial attorney's motion to withdraw from the post-conviction proceeding and appointing another attorney to represent Smith. At approximately the same time the record on appeal from the state trial court was docketed in the Kansas Supreme Court. Thus, at the time the Court of Appeals for the Tenth Circuit issued its decision, more than one year had elapsed since Smith had filed his motion for post-conviction relief and he had still not been able to present his arguments to the Kansas Supreme Court. Over the objection that Smith had failed to exhaust his pending state court remedy, the Court of Appeals declared:

> "The federal courts have the inescapable duty to entertain a solid claim of an unconstitutional restraint by a state under color of its law, and jurisdiction is not defeated by anything which may occur in the state proceedings. See Fay v. Noia, supra, 372 U. S. 426, 83 S.Ct. 822; Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L. Ed.2d 770; Chase v. Page, 10 Cir., 343 F.2d 167, 171. Consistently with these inexorable principles we have recognized that inordinate delay in the adjudication of an asserted post-conviction remedy may very well work a denial of due process cognizable in the federal court. See Kelly v. Crouse, 10 Cir., 352 F.2d 506."

356 F.2d at 656. The Court of Appeals then reversed and remanded the case to the trial court "with directions to take such steps as it deems necessary to secure petitioner's right to a prompt hearing on his claim of unconstitutional restraint." *Id.* at 657. See also Jones v. Crouse, 360 F.2d 157 (10th Cir. 1966) (eighteen-month delay in appeal from denial of motion for post-conviction relief); Dixon v. State of Florida, 388 F. 2d 424 (5th Cir. 1968) (twenty-month delay in post-conviction proceedings); St. Jules v. Beto, 462 F.2d 1365 (5th Cir. 1972) (twenty-seven month delay in state habeas corpus proceedings); United States ex rel. Senk v. Brierley, 471 F.2d 657 (3rd Cir. 1973) (three and one-half year delay in post-conviction proceedings). *Cf.* Tramel v. Idaho, 459 F.2d 57 (10th Cir. 1972); Reynolds v. Wainwright, 460 F.2d 1026 (5th Cir.), cert. denied 409 U.S. 950, 93 S.Ct. 294, 34 L. Ed.2d 221 (1972); Rivera v. Concepcion, 469 F.2d 17 (1st Cir. 1972). As the court stated in Dixon v. Florida, *supra,* 388 F.2d at 426, "We must ever be sensitive both to the basics and to the nuances of judicial federal-state congruency. The concept of federal-state comity involves mutuality of responsibil-

ities, and an unacted upon responsibility can relieve one comity partner from continuous deference. Moreover, the wait for action on the writ must not be so exhausting as to frustrate its purpose. Patience is a virtue in the accommodation process of our federalism, but it is not inexhaustible."

The principle is not limited to collateral proceedings in state courts. In Way v. Crouse, 421 F.2d 145, 146–147 (10th Cir. 1970), the court stated:

"Just as a delay in the adjudication of a post-conviction appeal may work a denial of due process, so may a like delay in the determination of a direct appeal. The question presented here is in what court should petitioner seek vindication of his asserted constitutional grievance. In our view, Way properly resorted to the federal court, which should not, without knowing the facts and circumstances of the eighteen-month delay, have required him at this late date to commence a completely new and independent proceeding through the very courts which are responsible, on the face of the pleadings, for the very delay of which he complains."

See also Dozie v. Cady, 430 F.2d 637 (7th Cir. 1970) (seventeen-month delay in direct appeal); Odsen v. Moore, 445 F.2d 806 (1st Cir. 1971) (thirty-four-month delay in direct appeal: "[W]e confess to a sense of the absurd in saying to one who without success has for nearly three years tried to spur both his court-appointed counsel and, apparently, the courts to action, that he must persevere in perpetuity before he can complain of failure to a federal court." 445 F.2d at 807).

■ Where federal courts have determined that the delays experienced by a federal habeas corpus petitioner in the state courts have been excessive and unjustified, they have found the state corrective process "ineffective to protect the rights of the prisoner," 28 U.S.C. § 2254(b), and have proceeded to the merits of the petition. Where they have

further found that the petitioner's conviction was obtained in violation of his constitutional rights, they have granted the writ. In United States ex rel. Johnson v. Rundle, 286 F.Supp. 765 (E.D.Pa. 1968), the petitioner had suffered a delay of nineteen months in post-conviction proceedings following a conviction for rape in state court. With respect to the exhaustion doctrine, the court stated:

"Of course, the theoretical premise assumes that the states will allow the individual to present his claims without overly burdensome procedural snarls and to render decisions on them with reasonable dispatch. If the state does not act so, then the effect of the 'exhaustion doctrine' would be 'to shield an invasion of the citizen's constitutional rights.' Jordan v. Hutcheson, 323 F.2d 597, 601 (C.A.4, 1963)."

286 F.Supp. at 767. The court found that the delay was "so inordinate as to justify our proceeding to consider the merits." *Id.* Concluding, further, that petitioner's confession had been involuntary and that its introduction into evidence at petitioner's trial had deprived him of due process of law, the court granted the writ of habeas corpus. See also West v. State of Louisiana, 478 F. 2d 1026 (5th Cir. 1973) (seven-month delay in state habeas corpus proceedings); Morgan v. State of Tennessee, 298 F.Supp. 581 (E.D.Tenn.1969) (nineteen-month delay in state post-conviction proceedings). *Cf.* United States ex rel. Harper v. Rundle, 279 F.Supp. 1013 (E.D.Pa.1967); United States ex rel. Carter v. Commonwealth, 330 F.Supp. 593 (E.D.Pa.1971); Allen v. Leeke, 328 F. Supp. 292 (D.S.C.1971).

These principles have also been applied by federal courts in this Circuit. In United States ex rel. Lusterino v. Dros, 260 F.Supp. 13 (S.D.N.Y.1966), the petitioner had applied for federal habeas corpus in February, 1965, alleging that unlawfully seized evidence had been used against him, contrary to Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), and that admis-

sions to a police officer had been improperly introduced into evidence. The district court denied the petition without a hearing on the grounds that there were state remedies available to the petitioner. In March, 1966, "[p]roceeding with the intermittent assistance of unpaid counsel," the petitioner managed to file a state petition for coram nobis. In June, 1966, the state court ruled that the *Mapp* issue was unavailable for failure to raise it at trial, but that a hearing should be held on the issue of the admissions to the police officer. The hearing was scheduled for September, 1966, but apparently was delayed further. The petitioner again sought federal habeas corpus. The court said:

> "The foregoing chronology is enough to demonstrate that this court should move with all reasonable speed to hear at least petitioner's assertions under Mapp v. Ohio. This would be so even if nothing but the passage of time touched the decision of [the federal district court] almost two years ago. For it is clear that there are sharp limits to the sacrifices men must make upon the altar of comity. In cases of much briefer delay, it has been 'recognized that inordinate delay in the adjudication of an asserted post-conviction remedy may very well work a denial of due process cognizable in the federal court.' Smith v. State of Kansas, 356 F.2d 654, 656 (10th Cir. 1966)."

260 F.Supp. at 15–16. The court ordered that a hearing be held on petitioner's claims within four weeks. In a Supplemental Memorandum and Order, the court noted that on the eve of the scheduled hearing, the state had conceded the validity of petitiioner's claims under Mapp v. Ohio. The court thereupon granted the writ, noting that "[p]roperly administered, the rule barring federal habeas corpus until adequate state remedies have been exhausted implements cherished values of our federal system. The rule withers to a grisly ritual when it is employed for nothing more than delay in the vindication of constitutional rights." *Id.* at 17. See also United States ex rel. Graham v. Mancusi, *supra.* *Cf.* United States ex rel. Williams v. LaVallee, 487 F.2d 1006, 1015 n. 18 (2d Cir. 1973); United States ex rel. Hill v. Deegan, 268 F. Supp. 580 (S.D.N.Y.1967); United States ex rel. Goodman v. Kehl, 456 F.2d 863 (2d Cir. 1972).

## C. The Delay In The Instant Case

■ Whether the delay in the direct appeal in any particular case has been excessive and unjustified will depend, of course, upon the specific circumstances presented. On their face the Connecticut appellate procedures do not appear to provide for an inordinately lengthy process. An appeal must be filed within twenty days from the date of judgment, which in a criminal case is the date sentence is pronounced in open court.[15] The party appealing must file with his appeal a request for a finding and a draft finding containing a statement of what each party offered evidence to prove, the questions of law and, to test rulings on evidence, the specific portion of the trial record which disclosed the context in which the ruling was made.[16] Ten days after the request for finding and draft finding are filed, the appellee must file a draft counterfinding.[17] Both the draft finding and the draft counterfinding must make appropriate references to the pages of the transcript of the trial.[18] Thereafter the trial court must file its finding within two weeks, "unless it is unable to do so, in which case it shall file it at the earliest practicable time."[19] Corrections to the court's finding must be filed "as soon as practicable."[20] Within ten days from

---

15. Connecticut Practice Book § 601.

16. Connecticut Practice Book §§ 613, 614, 629, 630.

17. Connecticut Practice Book §§ 615, 631.

18. Connecticut Practice Book §§ 613, 614, 615, 629, 630, 631, 641.

19. Connecticut Practice Book §§ 618, 634.

20. Connecticut Practice Book §§ 626, 636.

the filing of the finding, the appellant must file his assignments of error.[21] When the assignments of error are filed, the record of the case is complete and is docketed with the Connecticut Supreme Court.[22] The appellant must then file his brief within forty-five days, the appellee's brief is due thirty days thereafter, and a reply brief may be filed within the next twenty days.[23] Thus, if all of these steps are taken in time, one hundred forty-nine days are alloted to counsel for preparation of the record and briefs. After the briefs are filed, the case is assigned for oral argument.[24]

While the appellate procedures theoretically provide for a final determination of a direct appeal within approximately six months, the procedure apparently works very differently in practice. The petitioner has submitted statistical tables representing the timetable of review of the seventy criminal appeals decided by the Connecticut Supreme Court between November 4, 1970, and December 18, 1973. The tables are not controverted or challenged by the state. The data indicate that during the three years covered by the tables, no criminal appeal taken by a defendant has received final determination by the Connecticut Supreme Court in less than thirteen months after a notice of appeal was filed.[25] Moreover, less than ten per cent of the criminal appeals by defendants decided during the three-year period were decided in less than eighteen months.[26] Slightly more than half the appeals were decided in eighteen to thirty months, and almost forty per cent of the appeals were pending more than thirty months before final decision.[27] The average length of time for a criminal appeal by a defendant was approximately thirty months.[28] By contrast, the average time for adjudication of an appeal in New Jersey during 1971–72 was 15.3 months.[29] In the federal system, during fiscal year 1973, the average time for an appeal from filing of notice of appeal in the lower court to final disposition was 8.8 months; in the Second Circuit, 6.1 months; in the District of Columbia Circuit, which had the longest period for processing of appeals, 13.5 months.[30]

The affidavits and statistical material submitted by the petitioner indicate some of the factors contributing to the extraordinary delays experienced by

21. Connecticut Practice Book § 612.

22. Connecticut Practice Book § 683.

23. Connecticut Practice Book § 724.

24. Connecticut Practice Book § 711.

25. *See* Table I to Petitioner's Brief.

26. *See* Appendix B to Table I to Petitioner's Brief.

27. *Id.*

28. *See* Table I to Petitioner's Brief.

29. Annual Report of the Administrative Director of the Courts of the State of New Jersey, pp. 8–9 (1973).

30. The amount of time required for the processing of an appeal in the federal system may be seen from the following table:

| Circuit | Filing of Notice of Appeal in Lower Court to Filing of Complete Record in App. Court * | Filing Complete Record to Disposition ** | Total |
|---|---|---|---|
| D.C. | 1.8 | 11.7 | 13.5 |
| 1 | 0.2 | 5.1 | 5.3 |
| 2 | 1.3 | 4.8 | 6.1 |
| 3 | 1.3 | 8.9 | 10.2 |
| 4 | 1.4 | 5.8 | 7.2 |
| 5 | 1.5 | 4.9 | 6.4 |
| 6 | 2.7 | 7.0 | 9.7 |
| 7 | 2.3 | 11.1 | 13.4 |
| 8 | 2.5 | 4.5 | 7.0 |
| 9 | 2.3 | 7.3 | 9.6 |
| 10 | 2.3 | 6.3 | 8.6 |
| Average | 1.8 | 7.0 | 8.8 |

* Administrative Office of the United States Court, Annual Report of the Director 1973, at p. A–7, Table B5.
** Administrative Office of the United States Courts, Management Statistics for United States Courts 1973, at p. f.

criminal defendants in the Connecticut appellate process. Court reporters are scheduled to work in the state courts from 10:00 a. m. to 5:00 p. m. Tuesday through Friday. Preparation of transcripts must therefore be done at night, on weekends, or on Mondays. As a consequence, trial transcripts, which must be completed before draft findings and draft counterfindings can be submitted, regularly take several months to complete.[31] There are further delays of several months while the draft findings are being drawn up by attorneys for the appellants.[32] Once the draft findings are filed, there are generally further delays of several months before the State's Attorneys prepare and file their draft counterfindings. Then the trial judges must find time amid the welter of ongoing court business to draw up their findings in all of their cases being appealed.[33] Apparently Connecticut is the only jurisdiction in the nation to require this time-consuming preparation of a finding.[34]

The delay suffered by the petitioner in this case is not extraordinary. That does not make it any more justifiable. It is evident from the foregoing that criminal defendants appealing their convictions in the courts of Connecticut experience, as a rule, very lengthy delays in the appellate process. The preparation of the record by counsel and the trial court, which the rules contemplate shall be completed in fifty-four days, generally takes four to six times that amount of time. And, regrettably, this processing of a record by proliferating a finding into it does not serve its vaunted purpose of framing the issues more correctly. *See* note 34, *supra.* In actual operation the "finding" is redun-

---

31. Affidavit of Joan E. Pagliuco, *supra* note 2.

32. The petitioner's statistics indicate that in approximately 28% of the criminal appeals, draft findings were filed up to two months after notice of appeal was filed; in almost 38% of the appeals, draft findings were filed between three and seven months after notice of appeal was filed; in the remainder of the appeals, one third of the total number of appeals, draft findings were filed eight months or more after notice of appeal was filed. *See* Table V to Petitioner's Brief. Former Chief Justice Maltbie states that the granting of extensions of time for the filing of requests for findings and draft findings is "the general rule." Maltbie, Appellate Procedure in the Supreme Court of Errors of Connecticut 156 (2d ed. 1957).

33. The Petitioner's statistics indicate that in less than 22% of the criminal appeals, findings were filed up to two months after the draft findings were filed; in half of the appeals, findings were filed three to seven months after the draft findings were filed; in the remaining 28% of the appeals, findings were filed eight months or more after the draft findings were filed. *See* Table VI to Petitioner's Brief.

34. Petitioner's Brief, p. 6; Table IV to Petitioner's Brief.

The "finding" does not have any intrinsic value. If the purpose of the finding is specification of the issues raised on appeal, *see* Maltbie, *supra* note 32, at 157, there is no reason why that purpose cannot be adequately served by the procedure utilized in other jurisdictions involving submission of briefs by the parties along with a stipulated record consisting of those portions of the record below which reveal the exact situation in which the issue being appealed arose and was ruled upon. The transcript of what occurred upon the trial is the underlying and basic record in any event. Whenever a "finding" is challenged the court is required to go to that record anyway.

The Connecticut judiciary apparently has its own doubts as to the utility of the "finding" in the state appellate process. In recently proposed changes to the appellate rules, the number of situations in which a finding will be required may be substantially reduced. The proposed rules provide that in a jury case there will be no finding, nor will an appendix be required, except under the following circumstances:

"If in the course of a case tried to the jury an issue is presented which requires a decision by the trial judge, a party adversely affected by any such decision may request a finding of fact as to that issue for appeal in accordance with the procedure for an appeal in a court case."

"Proposed Changes in Appellate Rules: Appeals in Jury Cases," 35 Conn.L.J. 2B (November 13, 1973). This is apparently designed to cover a situation where something relevant to a case occurred de hors the record, e. g., outside communication with a juror during the course of a trial. *See generally*, Clark, Judicial Reform in Connecticut, 5 Conn.L.Rev. 1 (1972).

dant. Indeed, the data indicate that a state prisoner sentenced to a relatively short prison term is effectively deprived of any direct appeal whatsoever, since he will very likely complete his sentence before his case is reviewed.[35]

▇▇▇ The three and one-half year period during which the direct appeal in the instant case has been pending, although somewhat longer than the average, is by no means unique among Connecticut cases. Nevertheless, this delay in adjudicating the petitioner's rights is clearly inordinate and excessive: it certainly offends the "limits to the sacrifices men must make upon the altar of comity." United States ex rel. Lusterino v. Dros, supra, 260 F.Supp. at 16. As the United States Supreme Court declared in Bartone v. United States, 375 U.S. 52, 54, 84 S.Ct. 21, 22, 11 L.Ed.2d 11 (1963), "Where state procedural snarls or obstacles preclude an effective state remedy against unconstitutional convictions, federal courts have no other choice but to grant relief in the collateral proceedings." Cf. Hunt v. Warden, Maryland Penitentiary, 335 F. 2d 936, 940–941 (4th Cir. 1964).

The state argues that this Court should not proceed to the merits of petitioner's claims because he has other available state remedies, i. e., state habeas corpus, Conn.Gen.Stats. § 52–466, and motion to set aside the judgment for lack of diligence in defending the appeal, Connecticut Practice Book § 696.

▇▇▇ The petitioner is not required, as a matter of law, to seek collateral

state remedies while his direct appeal is pending. As noted above, "once the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied." Picard v. Connor, supra, 404 U.S. 270, 275 (1971). The Supreme Court stated in Wilwording v. Swenson, supra, 404 U.S. 250:

> "Petitioners are not required to file 'repetitious applications' in the state courts. Brown v. Allen, 344 U.S. 443, 449 n. 3 [73 S.Ct. 397, 403, 97 L.Ed. 469] (1953). Nor does the mere possibility of success in additional proceedings bar federal relief. Roberts v. LaVallee, 389 U.S. 40, 42–43 [, 88 S.Ct. 194, 196–197, 19 L.Ed.2d 41] (1967); Coleman v. Maxwell, 351 F. 2d 285, 286 (C.A.6 1965).

And our own Court of Appeals has held, "Under the traditional concepts of exhaustion only one opportunity through proper channels need be afforded a state to pass upon a question before the [federal] habeas court should look [at] the merits." United States ex rel. Weinstein v. Fay, 333 F.2d 815, 819 (2d Cir. 1964). Having fairly presented his claims to the state courts by taking the route of a direct appeal, petitioner was not required to pursue alternate state avenues of relief at the same time.

▇▇▇ Moreover, the collateral remedies cited by the state appear to be illusory. While some forms of relief may be available to a defendant while his direct appeal is pending,[36] the clear rule in Connecticut is that state habeas corpus "cannot be utilized as a substi-

---

35. The United States Supreme Court has taken note of such a situation:
 "Arguably . . . if the prisoner could make out a showing that, because of the time factor, his otherwise adequate state remedy would be inadequate, a federal court might entertain his habeas corpus application immediately, under § 2254(b)'s language relating to 'the existence of circumstances rendering such [state] process ineffective to protect the right of the prisoner.' But we need not reach that issue here."
 Preiser v. Rodriguez, 411 U.S. 475, 497, 93 S.Ct. 1827, 1840, 36 L.Ed.2d 439 (1973).

36. A state prisoner may petition for a new trial on the ground of newly discovered evidence, Conn.Gen.Stats. § 52–270, while his direct appeal is pending. Dortch v. State, 142 Conn. 18, 110 A.2d 471 (1954). The petition for a new trial is not available to petitioner in the instant case: he does not claim to have found new evidence, and in any event petitions for a new trial must be brought within three years of the date of the judgment complained of, Conn.Gen.Stats. § 52–582.

tute for an appeal of the original action, or for a writ of error, or for a petition for a new trial. In re Bion, 59 Conn. 372, 386, 20 A. 662 [11 L.R.A. 694]. It may not be employed to review irregularities or errors of procedure or questions as to the sufficiency of evidence. Perell v. Warden, 113 Conn. 339, 342, 155 A. 221 . . . ." Wojculewicz v. Cummings, 143 Conn. 624, 628, 124 A.2d 886, 889 (1956). *See* United States ex rel. DeNegris v. Menser, 247 F.Supp. 826, 829 (D.Conn.1965), aff'd 360 F.2d 199 (2d Cir. 1966). An exception has been carved out of this rule for prisoners presenting federal constitutional claims *who have not taken a direct appeal*:

> "We hold, therefore, that a petitioner may collaterally raise federal constitutional claims in a habeas corpus proceeding *even though he has failed to appeal his federal constitutional claims directly to us* if he alleges and proves, by a fair preponderance of the evidence, facts which will establish that he did not deliberately bypass the orderly procedure of a direct appeal."

Vena v. Warden, 154 Conn. 363, 366–367, 225 A.2d 802, 804 (1966) (emphasis added). Since petitioner's direct appeal is still pending, it is evident that state habeas corpus would not lie. Because petitioner *has* presented his claims on direct appeal, the *Vena* doctrine is not applicable to his case.

▇▇▇ The motion to set aside the judgment under § 696 of the Practice

Book may be granted "[i]f a party shall fail to defend against an appeal or writ of error with proper diligence. . . . ." Theoretically the motion might be used by a defendant whose direct appeal was being delayed, or ignored, by the state. In practice, however, the motion has rarely been granted on behalf of a defendant in a criminal appeal: [37] there do not appear to be any reported decisions in which it has been granted to set aside the judgment of a defendant convicted in Superior Court. Furthermore, the only grounds upon which the petitioner could claim lack of diligence on the part of the state would be in regard to the eleven extensions of time moved for and received by the State's Attorney for the filing of the counterfinding, which extended the appeal from January 3, 1972, to January 5, 1973. The extensions of time, which may be granted under § 665 of the Practice Book "for good cause shown," were all ordered by the trial judge.[38] In State v. Ward, 134 Conn. 81, 54 A.2d 507 (1947), where the trial court had granted several extensions of time for the filing of the requests for findings, the counterfinding, and the assignments of error, the Connecticut Supreme Court stated:

> "The various extensions of time granted by the trial court for filing appeal papers were made under provisions of the rules of court authorizing such action 'for good cause shown.' *We must, in considering this motion,*

---

37. A survey of the reported cases reveals only two instances in which the motion has been granted against the state, State v. Fenster, 151 Conn. 729, 197 A.2d 944 (1963), and State v. Stanley, 157 Conn. 625, 250 A.2d 326 (1969), but in both of these cases the appeals were from the Circuit Court and the judgments had been affirmed by the Appellate Division of the Circuit Court.

38. Petitioner's appellate counsel did not object to these extensions because the State's Attorney on the case had complained "that he was overworked, that he was receiving insufficient help, that he was then working nights and taking work home on weekends." Moreover, the appellate counsel had several times objected to the granting of extensions of time in Connecticut appeals, and "these motions for time extensions had nevertheless been summarily granted. Thus [he] felt that such opposition would be futile, and would serve no purpose other than to irritate [the State's Attorney] who could not, without additional assistance, move the case along more quickly." Affidavit of John R. Williams, counsel for John Wesley Ralls in his appeal to the Connecticut Supreme Court, dated January 25, 1974. In view of "the general rule" allowing extensions of time, see note 30 *supra*, it is highly unlikely that objections to the granting of extensions of time for filing papers would have been sustained.

*regard the extensions as properly granted, and as all papers were filed within the times fixed in them we cannot consider the failure by the defendants to file them earlier in determining whether they have prosecuted the appeals with reasonable diligence."* 134 Conn. at 83–84 (emphasis added). Certainly a habeas corpus petitioner cannot be required to pursue state remedies where such efforts will be futile. United States ex rel. Hughes v. McMann, 405 F.2d 773, 775–776 (2d Cir. 1968); Perry v. Blackledge, 453 F.2d 856, 857 (4th Cir. 1971), cert. granted 414 U.S. 908, 94 S.Ct. 218, 38 L.Ed.2d 145 (1973). Cf. Roberts v. LaVallee, 389 U.S. 40, 42–43, 88 S.Ct. 194, 19 L. Ed.2d 41 (1967).[39]

 Finally, the fact that the petitioner's appellate counsel did not object to the extensions of time requested by the State's Attorney between January 3, 1972, and January 5, 1973,[40] does not vitiate the delay experienced by the petitioner. The petitioner contends that he was unaware of such extensions of time and that he would have objected had he been aware of them:[41] at any rate, in the absence of purposeful procrastination on the part of the petitioner and his attorney, dilatoriness of petitioner's counsel in his direct appeal will not preclude the federal court from considering the merits of a habeas corpus petition,

Odsen v. Moore, *supra,* any more than will delay in the availability of the trial transcript, United States ex rel. Johnson v. Rundle, *supra,* 286 F.Supp. at 768, or delay occasioned by withdrawal of a defendant's original appellate attorney, Smith v. State of Kansas, *supra,* 356 F. 2d at 656, or delay resulting from the presence of other cases on the docket of the appellate court, Morgan v. State of Tennessee, *supra,* 298 F.Supp. at 583. As the court said in United States ex rel. Johnson v. Rundle, *supra,* regarding the unavailability of the trial transcript for approximately ten months: "This does not excuse the state's delay. It merely shifts the onus from the state judiciary to another arm of the state. And it is the entire state system that we look to in determining whether there has been inordinate delay." 286 F.Supp. at 768.

 In view of the foregoing, it is evident that the state court remedies are "ineffective to protect the rights of the [petitioner]," 28 U.S.C. § 2254(b), and that this Court should proceed to a consideration of the merits of his petition. To do otherwise "might well invite the reproach that it is the prisoner rather than the state remedy that is being exhausted," United States ex rel. Kling v. LaVallee, 306 F.2d 199, 203 (2d Cir. 1962) (concurring opinion), quoted in United States ex rel. Graham v. Man-

39. The state relies upon Roberson v. Robinson, Civil No. H–180 (D.Conn. November 9, 1973), for the proposition that § 696 of the Practice Book is an adequate state remedy available to the petitioner. In *Roberson* the petitioner sought federal habeas corpus, claiming that his direct appeals from his two state court convictions had been pending more than two years and that the state had not yet even filed counterfindings in the cases. Judge Clarie dismissed the petition for failure to exhaust state remedies, noting that "Section 696 of the Connecticut Practice Book provides the petitioner with a plain, speedy, and efficient state court remedy." *Id.* at p. 7. When Roberson returned to the Connecticut Supreme Court and filed a motion to set aside the judgment pursuant to § 696 of the Practice Book, Judge Clarie's faith in the Connecticut appellate proc-

ess was unfulfilled. At oral argument on the motion on January 2, 1974, the State's Attorney stated that the counterfinding on the first conviction was being typed and would be filed within a few days. He also stated that the counterfinding on the second conviction was far from completion. Affidavit of John R. Williams, appellate counsel for Jasper Roberson, dated April 5, 1974. The Connecticut Supreme Court granted the motion as to the first conviction *unless the state filed its counterfinding on or before January 22, 1974,* and denied the motion as to the second conviction. State v. Roberson (Conn.Sup.Ct. January 2, 1974), 35 Conn.L. J. 8 (January 15, 1974).

40. See note 39, *supra.*

41. Affidavit of John Wesley Ralls, dated January 23, 1974.

cusi, *supra,* 457 F.2d at 467, and in United States ex rel. Williams v. La-Vallee, *supra,* 487 F.2d at 1015 n. 18. This determination to proceed to the merits of the petition does not reward dilatoriness of counsel or offer the federal habeas courts as a substitute for the Connecticut direct appeal process. The petitioner has languished in prison for almost three and one-half years without having his claims ruled upon by any court, and the end, in the state courts, is not yet in sight: there is no indication whatsoever in the record that his appellate counsel has sought delay for its own sake or that petitioner has simply sought to circumvent the state appellate process. Compare United States ex rel. Wilson v. Rowe, 454 F.2d 585 (7th Cir. 1971), cert. denied 406 U. S. 909, 92 S.Ct. 1618, 31 L.Ed.2d 820 (1972). It is evident that substantial numbers of Connecticut defendants are experiencing protracted delays in the direct appeals of their state convictions. The state has important interests at stake in the exhaustion doctrine,[42] but these interests are ill-served when they are vindicated at the expense of the rights of individuals. Each petition for a writ of habeas corpus must of course be reviewed independently by the federal district court. "Delay that would be 'inordinate' in Kansas may be reasonable and unavoidable in Philadelphia." United States ex rel. O'Halloran v. Rundle, 260 F.Supp. 840 (E.D.Pa.1966). If a substantial period of time has elapsed since the notice of appeal was filed and the Connecticut Supreme Court has not rendered a decision in the petitioner's case, a number of factors must be as-

sessed in order to determine whether the delay in the particular case has been excessive and unjustified, including: the length of the trial and of the trial transcript, delays in completion of the transcript, the number and complexity of the issues raised on appeal by the defendant, the number and length of extensions of time granted to the defendant's counsel or to the State's Attorney for the filing of appeals papers, and the failure of the defendant's counsel or the State's Attorney to process the appeal with due diligence. While the court must weigh each of these factors as appropriate, it is expected that federal habeas petitions evidencing state appellate delays of eighteen months or more without a final determination by the Connecticut Supreme Court will be reviewed with particular scrutiny in order to insure that the rights of state defendants in criminal appeals are not unconstitutionally impaired. United States ex rel. Lusterino v. Dros, *supra*; United States ex rel. Johnson v. Rundle, *supra*; Way v. Crouse, *supra*; Dozie v. Cady, *supra.* See Note, Developments in the Law—Federal Habeas Corpus, 83 Harvard L.Rev. 1038, 1098 (1970). To the extent that this policy heightens the responsibility of state trial judges to be less disposed to grant numerous extensions of time to attorneys for the filing of appeals papers, and sharpens the responsibility of appellate counsel and State's Attorneys to treat criminal appeals with dispatch, the interests of justice will be that much better served. Implementation of the proposed changes in the Connecticut appellate rules,[43] reducing the time-consuming preparation of the

---

42. "As applied in our earlier decisions, the doctrine
 'preserves the role of the state courts in the application and enforcement of federal law. Early federal intervention in state criminal proceedings would tend to remove federal questions from the state courts, isolate those courts from constitutional issues, and thereby remove their understanding of and hospitality to federally protected interests. Second, [the doctrine] preserves orderly administration of state judicial business, preventing the interrup-

tion of state adjudication by federal habeas proceedings. It is important that petitioners reach state appellate courts, which can develop and correct errors of state and federal law and most effectively supervise and impose uniformity on trial courts.'
 Note, Developments in the Law—Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1094 (1970)."
 Braden v. 30th Judicial Circuit Court of Kentucky, *supra,* 410 U.S. at 490–491.

43. *See* note 34, *supra.*

"finding," may go a long way toward remedying a situation which is at best depressing and at worst intolerable.

## II. PETITIONER'S SUBSTANTIVE CLAIMS

The petitioner claims that his constitutional rights were denied at his trial in several respects: (1) that the jury was improperly informed of his prior arrests; (2) that the trial judge's instructions to the jury applied improper pressure on the jury to agree to a verdict; (3) that statements made by the petitioner at the time of his arrest were improperly admitted for consideration by the jury; (4) that he was denied effective assistance of counsel before and during his trial; and (5) that unconsented-to substitution of defense counsel during the jury deliberations and the rendering of the verdict denied him the effective assistance of counsel. Because of the Court's conclusions regarding the first two claims urged by the petitioner, it is unnecessary to consider the remaining claims.[44]

### A. Evidence of Petitioner's Prior Arrests

During the state's case in chief, while the State's Attorney was conducting his direct examination of Sergeant James E. McDonald of the Connecticut State Police Department Bureau of Identification, the following occurred:

Q Showing you this fingerprint card, Sergeant, can you tell me whose fingerprint card that is?

A This is a fingerprint card of John Ralls, which was on file at the Bureau of Identification, also C.S.P.I. 227299.

Q What is the C.S.P. number?

A It is a central bureau for all the criminal arrest records in the State of Connecticut.

Q All right.[45]

At that point the trial judge spoke to the jury regarding Sgt. McDonald's testimony:

THE COURT: Just a moment. I ought to caution this jury at this particular time, that whatever it was, it might have been just a minor matter. I don't know the extent of it. It doesn't affect this case, nor is it introduced for that purpose.[46]

The defendant's counsel then asked that the jury be excused, and in the absence of the jury requested a mistrial. The trial judge denied the motion, stating:

As I say, I think I could duly caution the jury on it. I don't feel it is grounds enough for me, at this point, to declare a mistrial, but I think it is dangerously real close to it.[47]

When the members of the jury returned, the trial judge again spoke to them about Sgt. McDonald's testimony:

I want to caution the jury again, that I don't know what the extent it covers, whether it might have been an application for employment. You are not to give it any more weight than that. This man is being tried here on this case only.[48]

44. The parties agreed to dispense with the taking of oral evidence at a hearing and instead to submit this case for decision upon the pleadings, briefs, stipulations, affidavits, and exhibits submitted by counsel. These materials were to be submitted in accordance with a schedule contained in an Order of this Court dated January 11, 1974. The parties subsequently agreed to extend this schedule by two weeks. The petitioner submitted an extensive brief covering the exhaustion question and the issues on the merits. However, after obtaining an additional extension of time for the filing of its brief "due to the complexity of the issues involved," the respondent has limited its argu-ments to the issue of exhaustion of state remedies and has "respectfully declined" to discuss the substantive constitutional issues raised by the petition. Respondent's claim that the issues "should remain before the Connecticut Supreme Court" notwithstanding, this Court would clearly not be justified in acceding to still more delay in the consideration of petitioner's claim, and therefore it now proceeds to the substantive issues.

45. Transcript, p. 82.

46. Id.

47. Transcript, p. 83.

48. Transcript, p. 84.

The fingerprint card was then marked and received into evidence as a State's exhibit.

It is evident that, as a result of this exchange, the fact that the petitioner had a record of prior arrests was before the jury. If there was any doubt in the mind of any member of the jury as to the petitioner's prior record, it was certainly dispelled by the fingerprint card itself. On the front side of the card the name, race, and sex of the petitioner are listed and the petitioner's fingerprints and signature appear. On the reverse side of the card, a white sheet of paper covered the central area, but three printed items were apparent. At the top left corner of the card was the following: "Connecticut State Police, Hartford 1, Conn." At the top right corner of the card appeared, "STATE BUREAU OF IDENTIFICATION." At the bottom of the card, just below the white sheet covering the central portion of the card, was the statement, "Please furnish all *additional* criminal history and police record on separate sheet."[49] The jury was surely led to the conclusion that the white sheet over the central portion of the card covered entries indicating petitioner's "criminal history and police record." The petitioner did not testify at the trial, nor did he otherwise put his character in evidence.

▆▆▆ The courts have long recognized that proof of other crimes committed by a defendant may prejudice the defendant with the members of the jury and deny him a fair trial. As the Supreme Court stated more than eighty years ago:

"Proof of [other crimes committed by the defendants] only tended to prejudice the defendants with the jurors, to draw their minds away from the real issue, and to produce the impression that they were wretches whose lives were of no [real] value to the community, and who were not entitled to the full benefit of the rules prescribed by law for the trial of human beings

charged with crime involving the punishment of death."

Boyd v. United States, 142 U.S. 450, 458, 12 S.Ct. 292, 295, 35 L.Ed. 1077 (1892). In Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), the Court made it clear that unless the defendant himself opens up the issue of his character, the prosecution is absolutely prohibited from introducing any evidence on the subject. Thus, as a general rule, the law

"simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief. The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice."

*Id.* at 475–476 (footnotes omitted).

The Court of Appeals for the Second Circuit has recently had occasion to discuss this issue in a case very similar to the instant case. In United States v. Harrington, 490 F.2d 487 (2d Cir. 1973), the prosecution had attempted to bolster the testimony of a government witness who had failed to make an in-court identification of the defendant by having the witness duplicate, before the jury, an identification from "mug shot" photographs which he had previously made out of court. After objection by counsel for the defendant, and an ordered alteration of the photographs by

---

49. Exhibit 1 to Petitioner's Brief (emphasis added).

the trial judge, all in full view of the jury, the photographs were admitted into evidence.

The Court of Appeals succinctly summarized the issues and the applicable law:

"An examination of the issue proceeds from the recognition of a basic tenet of our criminal law. If, at his trial, a defendant does not take the witness stand in his own defense, or if he has not himself been responsible for causing the jury to be informed about his previous convictions, he is entitled to have the existence of any prior criminal record concealed from the jury. The defendant's right to this protection is so well understood that discussion of it is unnecessary. However, this protection may be lost by unexpected trial occurrences *such as occurred here* when the prosecution sought to salvage an identification by confronting its witness with appellant's photographs. That the introduction of photographs of a defendant may well be equivalent to the introduction of direct evidence of a prior criminal conviction has been articulated in a number of recent opinions which have recognized that the introduction of certain photographs may result in getting before the jury the fact that the defendant has a prior record, and so has deprived the defendant of his right to a fair trial."

490 F.2d at 490. Relying primarily upon United States v. Reed, 376 F.2d 226 (7th Cir. 1967), United States v. Harman, 349 F.2d 316 (4th Cir. 1965), and Barnes v. United States, 124 U.S. App.D.C. 318, 365 F.2d 509 (1966), the court specified three conditions which must exist if the introduction of "mug shot" type photographs is not to deny a defendant a fair trial:

"1. The Government must have a demonstrable need to introduce the photographs; and
2. The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and

3. The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs."

United States v. Harrington, *supra*, 490 F.2d at 494. Looking at the facts of the case before it, the court concluded that the failure of the government witness to make the in-court identification provided a "demonstrable need" to introduce the photographs. With respect to the second condition, the court stated:

"In this regard, it is helpful to recall Judge Leventhal's discussion in *Barnes* that the 'double-shot' picture produces a 'natural, perhaps automatic' inference of prior encounters with the police and that crude and inartful masking of these pictures heightens, rather than diminishes, their significance to the jury. 365 F.2d at 510–511. The photographs herein were 'masked,' but in a grossly incompetent fashion. Without basing our resolution of appellant's 'mug shot' contention on the second element of the test we propose, we think that the preferable course of action when mug shots are to be introduced would be to produce photographic duplicates of the mug shots. These copies would lack any incriminating indicia—i. e., inscriptions or identification numbers, and they could also avoid use of the juxtaposed full face and profile photographic display normally associated with 'mug shots.'"

490 F.2d at 495. Finally, the court noted that the entire discussion regarding the photographs took place in full view of the jury, and that when the trial judge ordered the court clerk to mask the pictures, "the jury's attention by this time was undoubtedly riveted on them." *Id.* (footnote omitted). The court therefore concluded that the defendant had been denied a fair trial and reversed and remanded for a new trial.

It is irrelevant, of course, whether the jury is led to believe that the defendant has a prior arrest record

by the improper introduction of "mug shot" photographs or of a State Police Bureau of Identification fingerprint card. Applying the three conditions governing the introduction of such items set forth in *Harrington,* it is evident at the outset that there was no "demonstrable need" for the introduction of the Bureau of Identification fingerprint card in the condition and manner in which it was introduced at the trial. If the State was seeking to show that latent prints found during the course of police investigation in the case compared favorably with those of the defendant, it could easily have had the defendant's fingerprints taken on a plain white sheet of paper. If the State was seeking to demonstrate that Sergeant McDonald had himself compared the latent prints with those of the petitioner on the Bureau of Identification card,[50] it was obligated to cover the entire card or to make duplicates of the petitioner's fingerprints, as suggested in *Harrington, supra,* 490 F.2d at 495, and to insure that its direct examination of its own witness would not indicate that the defendant had a prior arrest record. There were no circumstances at the trial similar to the failure of identification by the government witness which occurred in *Harrington.*

With respect to the second condition noted in *Harrington,* it is clear beyond doubt that the fingerprint card implied that the defendant had a prior criminal record. Both the testimony of Sergeant McDonald regarding the "C.S.P. number," and the printed material on the reverse side of the card indicated ineluctably that the defendant had a prior arrest record. Finally, with respect to the third *Harrington* condition, the manner in which the fingerprint card was introduced at trial drew even more attention to the implications of the card than had the introduction of the photographs in *Harrington.* At the petitioner's trial the judge's first cautionary instruction to the jury emphasized that the defendant had a prior record, "whatever it was" and despite the fact that "it might have been just a minor matter." When the defendant's counsel then asked that the jury be excused, the issue of the prior record became even more prominent. Finally, the trial judge emphasized the prior record again by giving the jury a second cautionary instruction. It would strain credulity to the breaking point to believe that the judge's weak and belated disclaimer, "I don't know what the extent it covers, whether it might have been an application for employment," had any real effect on the jury's perceptions. "The naive assumption that prejudicial effects can be overcome by instructions to the jury . . ., all practicing lawyers know to be unmitigated fiction." *Krulewitch v. United States,* 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949) (Jackson, J., concurring).

The cases relied upon by the Court of Appeals in *Harrington* support the conclusion that the petitioner in the instant case was denied a fair trial. In *Barnes v. United States, supra,* the government introduced two photographs of the defendant in an attempt to bolster the testimony of one of its witnesses. The first photograph was a "full-length snapshot of an ordinary nature," but the second was "a typical 'mug shot' from a police department 'rogues' gallery.'" 365 F.2d at 510. The numbers on the mug shot were covered with adhesive tape and the writing on the back was covered by paper. The defendant's counsel objected to the introduction of the pictures, and, although he allowed the pictures to be admitted, the trial judge told the jury that he was reluctant to allow them to take the pictures into the jury room for fear that one of them might inadvertently remove the paper covering on the back of the mug shot. The Court of Appeals stated, "It is well-settled law that the criminal record of a defendant may not be introduced into evidence at trial unless the defend-

50. Transcript, p. 83.

ant takes the stand or otherwise places his character in issue. A photograph which on its face reveals the existence of such a criminal record is likewise inadmissible when the defendant's character has not been placed in issue." *Id.* at 510 (footnotes omitted). As the court in *Harrington* noted, *Barnes* apparently turned on two considerations: that the introduction of the mug shot was unnecessary, in view of the introduction of the "snapshot of ordinary nature," and that the method of introduction of the photograph and the coverings on the mug shot itself emphasized the implications of the photograph:

> "The rudimentary tape cover placed over the prison numbers on the photograph, and over the notations on the reverse side, neither disguised the nature of the picture nor avoided the prejudice. If anything, by emphasizing that something was being hidden, the steps taken here to disguise the nature of the picture may well have heightened the importance of the picture and the prejudice in the minds of the jury."

*Id.* at 511.

Similarly, in United States v. Harman, *supra,* where unaltered mug shots were introduced at trial, the court stated:

> "Since Harman did not testify or put his character in issue, of course, any evidence of a previous conviction would have been inadmissible. This case does not come within any exception to this general rule. Particularly in whiskey cases, evidence of previous convictions is highly detrimental to a defendant's chances of acquittal. This is especially true when the defendant does not testify. In this case, as to defendant's failure to testify, the District Judge charged the jury fully and fairly. It is doubtful that anything the judge might have said could have removed the prejudice created by the introduction of these pictures, but in his charge, the District Judge did not mention them at all. It is our conclusion that the introduction of these pic-

tures in evidence was error, constituted serious prejudice to the cause of the defendant, and thus deprived him of a fair trial."

349 F.2d at 320. And in United States v. Reed, *supra,* the court held that testimony regarding a "mug shot" of the defendant, *i. e.,* "[a photograph] of [a former inmate] of the state prison," 376 F.2d at 227,

> " . . . vitiated his right to be presumed innocent until proven guilty and was prejudicial error. Repeated objections to this testimony were sustained, but the testimony remained. This testimony made the difference between the trial of a man presumptively innocent of any criminal wrongdoing and the trial of a known convict. His right not to take the stand in his own defense was substantially destroyed. His past record could not have been directly shown by the prosecution as part of its case to prove bad character since Reed's character was not in issue. The testimony did this indirectly."

*Id.* at 228. See also United States v. Dressler, 112 F.2d 972 (7th Cir. 1940); Leigh v. United States, 113 U.S.App.D. C. 390, 308 F.2d 345 (1962). Petitioner's case is clearly distinguishable from those in which the issue of the defendant's prior criminal record was opened up or used by the defendant himself, United States v. Frascone, 299 F.2d 824, 828–829 (2d Cir.), cert. denied 370 U.S. 910, 82 S.Ct. 1257, 8 L.Ed.2d 404 (1962); United States v. Silvers, 374 F.2d 828 (7th Cir.), cert denied 389 U.S. 888, 88 S.Ct. 128, 19 L.Ed.2d 189 (1967); United States v. Gimelstob, 475 F.2d 157, 161–162 (3rd Cir.), cert. denied 414 U.S. 828, 94 S.Ct. 49, 38 L.Ed. 2d 62 (1973), and those in which items introduced for identification purposes did not disclose the defendant's prior record or were unlikely to prejudice the defendant in the eyes of the jury, Sibley v. United States, 344 F.2d 103, 105 (5th Cir.), cert. denied 382 U.S. 945, 86 S.Ct. 405, 15 L.Ed.2d 354 (1965); Cupo v. United States, 123 U.S.App.D.C. 324,

359 F.2d 990, 994 (1966), cert. denied 385 U.S. 1013, 87 S.Ct. 723, 17 L.Ed.2d 549 (1967); United States v. Calarco, 424 F.2d 657, 660–661 (2d Cir.), cert. denied 400 U.S. 824, 91 S.Ct. 46, 27 L. Ed.2d 53 (1970); United States v. Jones, 155 U.S.App.D.C. 328, 477 F.2d 1213, 1219–1220 (1973). *Cf.* United States v. Miller, 381 F.2d 529, 536–537 (2d Cir. 1967), cert. denied, 392 U.S. 929, 88 S.Ct. 2273, 20 L.Ed.2d 1387 (1968).

■■■■ In light of the foregoing, it is evident that in the instant case the testimony by Sergeant McDonald regarding petitioner's fingerprint card, the two instructions by the trial judge to the jury, and the card itself, which was introduced into evidence, did not conceal the existence of any prior criminal record of the defendant, but in fact repeatedly called the jury's attention to such record.[51] These circumstances "made the difference between the trial of a man presumptively innocent of any criminal wrongdoing" and the trial of a man who likely had a criminal record. United States v. Reed, *supra,* 376 F.2d at 228. Beyond question, the petitioner was clearly prejudiced and was deprived of a fair trial. United States v. Harrington, *supra,* 490 F.2d at 490.[52] Not every evidentiary ruling rises to the magnitude of a constitutional issue. See Wilson v. MacDougall, Civil No. 13,815 (D.Conn. June 19, 1970). Although the issue of petitioner's prior arrest record arose in this case in the context of a ruling on evidence, the highly prejudicial character of the circumstances surrounding the ruling remove it from the class of merely harmful errors and demonstrate that it was so prejudicial as to result in the denial of that fair trial which the Constitution guarantees. There can be no question that the right to a fair trial is guaranteed by the Due Process Clause. As the Supreme Court stated in In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955), "A fair trial in a fair tribunal is a basic requirement of due process." See Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941); Lyons v. Oklahoma, 322 U.S. 596, 605, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944); Blackburn v. Alabama, 361 U.S. 199, 206, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); Gideon v. Wainwright, 372 U.S. 335, 342, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Washington v. Texas, 388 U.S. 14, 18 n. 6, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); Ham v. South Carolina, 409 U.S. 524, 526, 93 S. Ct. 848, 35 L.Ed.2d 46 (1973). Redress for the denial of a fair trial "is within the ambit of habeas corpus." Baker v. Hudspeth, 129 F.2d 779, 781 (10th Cir.), cert. denied sub nom. Baker v. Hunter, 317 U.S. 681, 63 S.Ct. 201, 87 L.Ed. 546 (1942). See United States ex rel. Meers v. Wilkins, 326 F.2d 135 (2d Cir. 1964); Frayer v. Turner, 296 F.Supp. 1256 (D. Utah), aff'd 413 F.2d 546 (10th Cir. 1969); Hernandez v. Nelson, 298 F. Supp. 682, 685–687 (N.D.Cal.1968), aff'd 411 F.2d 619 (9th Cir. 1969); Hawkins v. Robinson, *supra,* 367 F.Supp. at 1034, 1036. Since the circumstances surrounding the introduction of the fingerprint card were so prejudicial as to deny the petitioner a fair trial, he is entitled to issuance of the writ.

51. The record does not indicate whether the petitioner did in fact have a prior arrest record. The prejudice to him at his trial, however, did not come from the *fact* of any record of prior arrests, but by the strong implication that such record existed, engendered by the testimony of Sergeant McDonald, the instructions of the trial judge, and the fingerprint card itself. Indeed, jurors applying common sense could readily conclude that if the defendant did *not* have a record of prior arrests, there would be no reason to cover the reverse side of the fingerprint card with white paper.

52. The instant case is clearly distinguishable from Spencer v. Texas, 385 U.S. 554, 87 S. Ct. 648, 17 L.Ed.2d 606 (1967), in which the Court upheld procedures by which the jury was informed of the defendant's prior convictions *only* in the context of enforcement of the state's habitual criminal statutes. In the instant case, the testimony of Sergeant McDonald and the Bureau of Identification fingerprint card did not serve any such "valid state purpose," 385 U.S. at 563, but served only to eliminate the presumption of innocence to which the petitioner was entitled.

### B. *The Trial Judge's Supplemental Instructions to the Jury*

Approximately two hours and forty-five minutes after the jury began deliberations, the trial judge called the jury back into the courtroom and the following occurred:

"THE COURT: I have called you all because of the hour. I am not trying to hurry your deliberations at all. I want you to have time enough to consider them, and consider them with all the thought that you can. However, I would like to know if it is a matter of a couple of hours, I can send out and get sandwiches. If it is a matter of more than that, and you want to have dinner, it can be arranged. I can send out and make those arrangements. *I cannot allow you to leave before I have some sort of verdict.*

*You could readily see, if somebody got sick overnight, I would have to declare a mistrial, and this case would have to start all over again. It would be an impossibility.*

Is anybody in a position to tell me how long you feel that you want, or whether sandwiches would do, or would you like a sit-down dinner?

A JUROR: I think it is going to be a while.

THE COURT: That is all I need to know. You may retire to the jury room, and arrangements will be made. Thank you very much."[53]

The jury then retired to continue its deliberations. Approximately three hours later, the following occurred:

"THE COURT: Resume our session. Call the jury. (Francis J. McQuade, Esquire appeared in Mr. DeMayo's stead.)

THE COURT: Good evening ladies and gentlemen. I sense that you must be having a little difficulty in reaching your verdict. However, as I have told you time and again, your verdict must be unanimous. It is true, of course, that a verdict to which each juror agrees, has got to be his own conclusion and not the mere acquiescence in or the conclusions of his fellows.

That does not mean that each juror should pursue his own deliberations and judgment with no regard for the arguments and conclusions of his fellows, or that having reached a conclusion, he or she should obstinately adhere to it without a conscientious effort to test its validity by the views entertained by the other jurors.

I am not telling you what to do. I am going to send you back in. Follow that theory, *that you will resolve yourselves to do your duty and follow the thoughts of other jurors whom, I am sure, are equally as wise and have heard the same evidence.* You may return to the jury room, and I hope it has shed some light. Thank you."[54]

Less than one hour later the jury sent the judge a question, "In the case of a murder one verdict, are we the sole judges of penalty of life imprisonment or death?"[55] The judge replied in the affirmative, and ten minutes later the jury brought in a verdict of guilty of murder in the second degree.[56] The petitioner does not challenge the propriety, *per se*, of a trial judge's giving supplemental instructions to a deadlocked jury, and with good reason. The Supreme Court long ago held that such instructions do not in themselves violate a defendant's constitutional rights. United States v. Allis, 155 U.S. 117, 123, 15 S. Ct. 36, 39 L.Ed. 91 (1894). Rather, the petitioner contends that the supplemental instructions were given "[w]ithout any indication of a jury deadlock,"[57] and that the instructions coerced the jury into rendering a verdict and thereby deprived him of due process of law.

53. Transcript, pp. 347–348 (emphasis added).

54. Transcript, pp. 348–349 (emphasis added).

55. Transcript, p. 349.

56. Transcript, p. 351.

57. Petitioner's Brief, p. 46.

The problem facing a trial judge when a jury is experiencing difficulty reaching a verdict "is by no means new." United States v. Bailey, 468 F.2d 652, 665 (5th Cir. 1972). "The solution of the 14th century circuit-riding judge was simply to load the jurors into ox-carts and carry them about with him until a verdict was 'bounced out.'" Note, Deadlocked Juries and Dynamite: A Critical Look at the "Allen Charge," 31 U.Chi.L.Rev. 386 (1964). Such jurors were "kept without meat, drink, fire, or candle, unless by permission of the judge, till they . . . all unanimously agreed." People v. Sheldon, 156 N.Y. 268, 50 N.E. 840, 842 (1898). Such measures have gone out of fashion in more recent years, although trial judges have threatened to deprive the jury of water and heat, in the dead of winter, while they continued to deliberate, Mead v. City of Richland Center, 237 Wis. 537, 297 N.W. 419 (1941), and have required the jurors to deliberate throughout the night, Commonwealth v. Moore, 398 Pa. 198, 157 A.2d 65 (1959).

A "more subtle technique, however, was soon found to be the giving of supplemental instructions, which exhorted the jury to arrive at a verdict." United States v. Bailey, *supra*, 468 F.2d at 665. Such instructions received early approval by the highest courts of Massachusetts, Commonwealth v. Tuey, 62 Mass. (8 Cush.) 1 (1851), and Connecticut, State v. Smith, 49 Conn. 376, 386 (1881).[58] In 1896 the United States Supreme Court, in Allen v. United States, 164 U.S. 492, 501-502, 17 S.Ct. 154, 41 L.Ed. 528 (1896), put its stamp of approval on supplemental instructions virtually identical to those upheld in Commonwealth v. Tuey and State v. Smith:

> "These instructions were quite lengthy and were, in substance, that in a large proportion of cases absolute certainty could not be expected; that although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority."

*Id.* at 501.[59]

---

58. "Although the verdict to which each juror agrees must, of course, be his own conclusion and not a mere acquiescence in the conclusions of his fellows, yet in order to bring twelve minds to a unanimous result, the jurors should examine with candor the questions submitted to them and with due regard and deference to the opinions of each other. In conferring together the jury ought to pay proper respect to each other's opinions, and listen with candor to each other's arguments. If much the larger number of the panel are for a conviction, a dissenting juror should consider whether the doubt in his own mind is a reasonable one which makes no impression upon the minds of so many men equally honest, equally intelligent with himself, who have heard the same evidence, with the same attention, and with equal desire to arrive at the truth, and under the sanction of the same oath. And on the other hand, if a majority are for acquittal, the minority ought seriously to ask themselves whether they may not reasonably, and ought not to, doubt the conclusions of a judgment which is not concurred in by most of those with whom they are associated, and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows." 49 Conn. at 386.

59. A second paragraph from the *Allen* opinion, equally relevant with the main charge, is generally not given by modern trial judges:
"While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows

The so-called "Allen charge" "was to become the wellspring from which all future judges would draw the solution to jury deadlocks." United States v. Bailey, *supra*, 468 F.2d at 665. The function of the Allen charge is obvious: it is intended to blast the jury out of the logjam in its deliberations, and has often been referred to as the "dynamite" charge. Though often criticized by appellate courts and commentators alike, the charge continues in widespread use "precisely because it works, because it can blast a verdict out of a jury otherwise unable to agree that a person is guilty." United States v. Bailey, *supra*, 468 F.2d at 666.

It is well-recognized that the central defect in the Allen charge is that it is unbalanced; *i. e.*, it requires only the members of the minority on the jury, and not those of the majority, to re-examine their views. United States v. Fioravanti, 412 F.2d 407, 417 (3rd Cir.), cert. denied, Panaccione v. United States, 396 U.S. 837, 90 S.Ct. 97, 24 L. Ed.2d 88 (1969); Note, Future Renditions of "Allen"-type Charges Must Conform to the Standard Approved by the American Bar Association, 9 Houston L.Rev. 570, 571 (1972). The jurors in the minority may reasonably believe that the charge is directed solely at them, and that the trial judge has revealed what he believes the "correct" verdict to be. Note, Due Process, Judicial Economy and the Hung Jury: A Reexamination of the *Allen* Charge, 53 Va.L.Rev. 123, 129 (1967); Note, On Instructing Deadlocked Juries, 78 Yale L.J. 100, 139 (1968); Note, Deadlocked Juries and Dynamite, *supra*, at 388.

The great danger of the Allen charge is that its imbalance will have a coercive effect upon the jurors in the minority, *i. e.*, that it will impel them to accept the majority view in spite of their own conscientious convictions as to the defendant's guilt or innocence. Because of this danger, courts have often required the trial judge to mitigate the effect of the Allen charge by assuring the jurors "in some form that a juror was not expected, in deference to the other jurors, to abandon his conscientious convictions." United States v. Kenner, 354 F.2d 780, 783 (2d Cir. 1965), cert. denied 383 U.S. 958, 86 S.Ct. 1223, 16 L.Ed.2d 301 (1966). Thus in United States v. Rao, 394 F.2d 354 (2d Cir.), cert. denied 393 U.S. 845, 89 S.Ct. 129, 21 L.Ed.2d 116 (1968), the Court of Appeals for the Second Circuit stated that "[t]he considerable costs in money and time to both sides if a retrial is necessary certainly justify an instruction to the jury that if it is possible for them to reach a unanimous verdict *without any juror yielding a conscientious conviction* . . . they should do so." *Id.* at 355 (emphasis added). This has been the consistent position of our Court of Appeals. See United States v. Curcio, 279 F.2d 681 (2d Cir.), cert. denied 364 U.S. 824, 81 S.Ct. 59, 5 L.Ed.2d 52 (1960); United States v. Thomas, 282 F.2d 191 (2d Cir. 1960); United States v. Tolub, 309 F.2d 286 (2d Cir. 1962); United States v. Kahaner, 317 F.2d 459, 483–484 (2d Cir.), cert. denied Corallo v. United States, 375 U.S. 835, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963); United States v. Kenner, *supra*, 354 F.2d at 782–783; United States v. Bilotti, 380 F.2d 649, 654 (2d Cir.) cert. denied 389 U.S. 944, 88 S.Ct. 308, 19 L.Ed.2d 300 (1967); United States v. Meyers, 410 F.2d 693, 697 (2d Cir.), cert. denied 396 U.S. 835,

that opinions may not be changed by conference in the juryroom. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury-room with a blind determination that the verdict shall represent his opinion of the case at that moment; or, that he should close his ears to the arguments of men who are equally honest and intelligent as himself."
164 U.S. at 501–502.

90 S.Ct. 93, 24 L.Ed.2d 86 (1969); United States v. Barash, 412 F.2d 26, 31–32 (2d Cir.) cert. denied 396 U.S. 832, 90 S.Ct. 86, 24 L.Ed.2d 82 (1969); United States v. Hynes, 424 F.2d 754, 757 (2d Cir.) cert. denied 399 U.S. 933, 90 S.Ct. 2270, 26 L.Ed.2d 804 (1970); United States v. Bowles, 428 F.2d 592, 595 (2d Cir.), cert. denied 400 U.S. 928, 91 S.Ct. 193, 27 L.Ed.2d 188 (1970); United States v. Cassino, 467 F.2d 610, 619 (2d Cir. 1972), cert. denied 410 U.S. 928, 93 S.Ct. 1363, 35 L.Ed.2d 590 (1973); United States v. Jennings, 471 F.2d 1310, 1313–1314 (2d Cir.), cert. denied 411 U.S. 935, 93 S.Ct. 1909, 36 L. Ed.2d 395 (1973). Moreover, several courts have sanctioned the Allen charge only when the instruction given by the trial judge does not deviate from the language of the *Allen* opinion. A few courts have refused to allow use of the Allen charge at all, and the American Bar Association has recommended that it be replaced.[60] The state of the law is summarized in United States v. Bailey, *supra*, 468 F.2d at 667–668, in which the Court of Appeals for the Fifth Circuit sustained an Allen charge with deep regret and only on the ground that other panels of the court had refused to abandon the instruction:

"(1) The District of Columbia Circuit has exercised its supervisory jurisdiction to abolish *Allen* and has replaced it with the ABA standard. *See*

United States v. Thomas, 1971, 146 U.S.App.D.C. 101, 449 F.2d 1177, 1187 (en banc).

(2) The First Circuit has said that the dynamite charge 'should be used with great caution, and only when absolutely necessary.' United States v. Flannery, 1 Cir. 1971, 451 F.2d 880, 883. Although it did not require trial courts to employ the ABA standard, the First Circuit effectively ordered that if *Allen* charges are to be used, the *Allen* language must be precisely followed.

(3) The Second Circuit has such 'grave doubts' about *Allen* that it has given notice that it will not tolerate the slightest deviation from the approved language; furthermore, the Court stated that it permitted *Allen* to stand only by 'the barest margin.' *See* United States v. Kenner, 2 Cir. 1965, 354 F.2d 780, 782–784.

(4) The Third Circuit has flatly abolished the dynamite charge. 'Hereafter this court will not let a verdict stand which may have been influenced in any way by an *Allen* Charge.' United States v. Fioravanti, 3 Cir. 1969, 412 F.2d 407, 420.

(5) The Fourth Circuit has for a decade refused to allow trial judges to depart in the least from the language of the *Allen* case itself. *See* United States v. Rogers, 4 Cir. 1961, 289 F.2d 433.

---

**60.** American Bar Association, Standards Relating to Trial by Jury 145–46 (1968):

"§ 5.4 Length of Deliberations; deadlocked jury.

"(a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:

(i) that in order to return a verdict, each juror must agree thereto;

(ii) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

(iii) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

(iv) that in the course of deliberations, a juror should not hesitate to reexamine his

own views and change his opinion if convinced it is erroneous; and

(v) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors or for the mere purpose of returning a verdict.

"(b) If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in subsection (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

"(c) The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement."

(6) The Sixth Circuit has reversed convictions where only the slightest addition to the original *Allen* charge was made. *See, e. g.,* United States v. Harris, 6 Cir. 1968, 391 F.2d 348, 355.

(7) The Seventh Circuit has abolished the *Allen* charge in favor of the ABA recommendation. United States v. Brown, 7 Cir. 1969, 411 F.2d 930; Brandom v. United States, 7 Cir. 1970, 431 F.2d 1391.

(8) The Eighth Circuit allows only the unadulterated recitation of the Supreme Court's paraphrase of the trial court's charge in *Allen,* and even reading the Supreme Court's 'second paragraph' to the jury is prohibited. *See* Chicago & E. I. Ry. v. Sellars, 8 Cir. 1925, 5 F.2d 31.

(9) The Ninth Circuit allows a supplemental instruction that does not urge the minority to rethink their position, does not tell the jury they must reach a verdict, but that simply tells the jury to keep trying. *See* Walsh v. United States, 9 Cir. 1967, 371 F.2d 135.

(10) The Tenth Circuit 'cautiously' approves *Allen,* but it finds reversible error when any departures are made from the approved instruction's language. *Compare* Burroughs v. United States, 10 Cir. 1966, 365 F.2d 431, *with* Thompson v. Allen, 10 Cir. 1956, 240 F.2d 266. *See also* Goff v. United States, 10 Cir. 1971, 446 F.2d 623.

States too have joined the abandonment of *Allen.* Arizona has abolished *Allen* in its entirety. State v. Thomas, 86 Ariz. 161, 342 P.2d 197 (1959). Montana has put *Allen* to rest. State v. Randall, 137 Mont. 534, 353 P.2d 1054 (1960). Kansas, Idaho, and Iowa disapprove of and discourage any use of the dynamite charge. *See, e. g.,* Eikmeier v. Bennett, 143 Kan. 888, 57 P.2d 87, 92 (1936); State v. Moon, 20 Idaho 202, 117 P. 757 (1911); and Middle States Util. Co. v. Incorporated Tel. Co., 222 Iowa 1275, 271 N.W. 180 (1937). Missouri allows only a 'temperate and moderate'

supplemental instruction. *See* State v. Bozarth, 361 S.W.2d 819, 826 (Mo. Sup.1962)." (Footnote omitted).

█ Finally, a trial judge is absolutely forbidden to tell a jury that it must reach a verdict. In Jenkins v. United States, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965), the trial judge had advised a deadlocked jury, "You have got to reach a decision in this case." The Supreme Court found that the judge's instruction was coercive and therefore reversed the defendant's conviction in a *per curiam* decision in which it quoted from the brief of the Solicitor General:

> Of course, if this Court should conclude that the judge's statement had the coercive effect attributed to it, the judgment should be reversed and the cause remanded for a new trial; the principle that . jurors may not be coerced into surrendering views conscientiously held is so clear as to require no elaboration.

380 U.S. at 446. *Cf.* Brasfield v. United States, 272 U.S. 448, 450, 47 S.Ct. 135, 71 L.Ed. 345 (1926); United States v. Samuel Dunkel, 173 F.2d 506 (2d Cir. 1949). See Note, On Instructing Deadlocked Juries, *supra,* at 136.

█ In the instant case, the trial judge's supplemental instructions compounded manipulation with misdirection, all to the undoubted prejudice of the defendant. The trial judge's statement in his first supplemental instruction, "I cannot allow you to leave before I have some sort of verdict," can only be seen as the kind of command to the jury so summarily condemned by the Supreme Court in *Jenkins.* The pronouncement that a declaration of a mistrial was inconceivable, that it "would be an impossibility," was a clearly erroneous statement of the law.

█ The trial judge gave his second supplemental instruction without having received any communication from the jury that it was unable to agree. The language of the instruction was not the language of the Allen charge. The in-

struction, in effect, paid lip service to the proposition that each juror should follow his own convictions, in the only portion of the instruction which tracked the language of State v. Smith, then laid strong emphasis on the desirability of jurors re-examining their own views in light of the conclusions reached by the others. Although the instruction did not in terms urge those jurors in the minority to give careful consideration to the views of the majority, that point was undoubtedly clear from the circumstances and the context of the judge's admonition. The directive to "Follow that theory, that you will resolve yourselves *to do your duty and follow the thoughts of other jurors* whom, I am sure, are equally as wise and have heard the same evidence" (emphasis added), was unquestionably an injunction to the jurors in the minority to "follow," as a matter of "duty," the conclusions of the majority, whatever they might be. The trial judge gave no mitigating instruction assuring the jurors in the minority that they were not to yield their conscientious convictions: indeed, the thrust of the total instruction was that the jurors in the minority *should* yield their own views in favor of those of the majority. The impact of the judge's earlier promise to keep the jurors there until they reached a verdict could not have been lost on the recalcitrant members of the jury. The supplemental instructions in the instant case were no "dynamite charge," designed to blast the jury off dead center: they were more like a nuclear detonation, annihilating the dissenters completely. These instructions, erroneous in their substance and coercive in their effect, denied the petitioner a fair trial and therefore deprived him of a right guaranteed by the Constitution. See p. 1291 *supra*. As our Court of Appeals stated more than forty years ago in a case raising similar issues:

> "The cases all recognize that the surrender of the independent judgment of a jury may not be had by command or coercion. It is not enough to cure the error to conventionally say that it is the function of the jury to decide questions of fact. Pressure of whatever character, whether acting on the fears or hopes of the jury, if so exerted as to overbear their volition without convincing their judgment, is a species of restraint under which no valid judgment can be made to support a conviction. No force should be used or threatened, and carried to such a degree that the juror's discretion and judgment is overborne, resulting in either undue influence or coercion. A judge may advise, and he may persuade, but he may not command, unduly influence, or coerce. The supplementary instructions were effective, but a breach of the right of the plaintiffs in error to an impartial charge, free from animated argument and coercive entreaties. What occurred deprived the plaintiffs in error of that fair and impartial trial the law accords to them, no matter how convincing their guilt may appear."

Wissel v. United States, 22 F.2d 468, 471 (2d Cir. 1927). *Cf.* Tumey v. Ohio, 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927) ("Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law."). Even if the two circumstances discussed herein—i. e., the presentation to the jury of highly prejudicial information regarding petitioner's prior arrest record, and the coercive supplementary instruction by the trial judge—were not, when viewed separately, thought to deprive the petitioner of that fair trial which is guaranteed by the Constitution, the *combination* of the prejudicial evidence and the coercive instruction, which in effect shattered the presumption of innocence and then forced the jury to a verdict, clearly violated petitioner's right to due process of law.

It is ordered that a writ of habeas corpus should issue out of this court discharging the petitioner from custody unless the petitioner, John Wesley Ralls, is afforded a new trial within sixty days.

This Court commends appointed counsel for the petitioner for their diligent and resourceful efforts in his behalf.