**John Wesley RALLS, Petitioner-Appellee,**

v.

**John R. MANSON, Commissioner of Correction of the State of Connecticut, Respondent-Appellant.**

**No. 1177, Docket 74–1682.**

United States Court of Appeals, Second Circuit.

Argued June 14, 1974.

Decided July 5, 1974.

Lumbard, Circuit Judge, filed concurring opinion.

Jerrold H. Barnett, Asst. State's Atty. for New Haven County, New Haven, Conn., for respondent-appellant.

Morton P. Cohen and David S. Golub, University of Connecticut School of Law Legal Clinic, West Hartford, Conn., for petitioner-appellee.

Before LUMBARD, HAYS and TIMBERS, Circuit Judges.

PER CURIAM:

Respondent-appellant, John R. Manson, Commissioner of Correction of the State of Connecticut, appeals from a judgment entered May 10, 1974 in the United States District Court for the District of Connecticut, M. Joseph Blumenfeld, *District Judge,* granting a petition for a writ of habeas corpus filed by petitioner-appellee, John Wesley Ralls, a state prisoner presently incarcerated at the Connecticut Correctional Institution at Somers where he is serving a sentence of life imprisonment imposed after his conviction by a jury of second degree murder. We reverse the judgment of the District Court and dismiss the petition for a writ of habeas corpus.

Ralls was indicted on June 15, 1970, charged with the murder on March 1, 1970 of his mother-in-law, Mrs. Barbara Howell, in Hamden. After a two week jury trial before Honorable Louis George in the Superior Court for New Haven County, Ralls was convicted on November 17, 1970 of second degree murder. He was sentenced on December 11, 1970 to life imprisonment. Throughout proceedings in the Superior Court, including the trial, Ralls was represented by the Public Defender for New Haven County.

On December 30, 1970, the same Public Defender, who in the meanwhile had been appointed to represent Ralls on appeal, filed in the Superior Court a timely notice of appeal to the Supreme Court of Connecticut from Ralls' murder conviction. On October 28, 1971, at Ralls' request, the Public Defender who had represented him up to that point and who had begun processing his appeal was permitted to withdraw as Ralls' appellate counsel. In his place, a Special Public Defender was appointed by the Superior Court to represent Ralls on appeal and he has done so continuously to date. This Special Public Defender is a lawyer whom Ralls specifically requested be appointed to represent him on appeal.

During the period of approximately three and one-half years from the filing of the notice of appeal to the present date, various steps have been taken pursuant to the Connecticut Practice Book to perfect Ralls' direct appeal to the state Supreme Court. We have been informed that the printed record on appeal was filed with the Supreme Court on October 31, 1973; that the Supreme Court has fixed a briefing schedule that calls for all briefs to be filed by September 18, 1974; and that the Supreme Court has scheduled the argument of the appeal at its October 1974 term, which means that the appeal will be argued during October.[1]

Backing up for a moment, Ralls filed his original petition for a writ of habeas corpus in the District Court on October 17, 1973, and an amended petition was

1. See State of Connecticut v. John W. Ralls, XXXV Conn.Law Journal, No. 51, pages 3-4 (June 18, 1974); and see note 5, *infra.*

filed on December 21, 1973. By agreement of counsel in the habeas corpus proceedings,[2] the District Court decided the case on the state court record, supplemented by various affidavits, exhibits and stipulations. No evidentiary hearing was held. On May 7, 1974, the District Court filed a memorandum of decision holding, first, that despite the pendency of Ralls' direct appeal to the state Supreme Court, it cannot be said that he has failed to exhaust state remedies as required by 28 U.S.C. § 2254(b) (1970); second, that of Ralls' five substantive claims of alleged denial of federal constitutional rights at his state trial,[3] two should be sustained (i. e. "(1) that the jury was improperly informed of his prior arrests", and "(2) that the trial judge's instructions to the jury applied improper pressure on the jury to agree to a verdict"); and, third, that Ralls should be discharged from custody unless afforded a new trial within sixty days. On May 20, the District Court entered an order staying execution of its judgment pending an expedited appeal to our Court. On June 4, we granted appellant's motion for an expedited appeal and we heard the appeal on June 14. At our request, counsel for each side furnished to us, prior to argument, short statements of their respective versions of the essential evidence at the Superior Court trial.

We do not reach the merits of Ralls' substantive claims; nor do we express any opinion as to whether they present issues of federal constitutional dimensions.

We reverse the judgment of the District Court and dismiss the petition solely on the ground that Ralls has failed to exhaust state remedies as required by § 2254(b). Picard v. Connor, 404 U.S. 270 (1971); United States ex rel. Gibbs v. Zelker, 496 F.2d 991 (2 Cir. 1974); United States ex rel. Nelson v. Zelker, 465 F.2d 1121 (2 Cir.), cert. denied, 409 U.S. 1045 (1972).

While we deplore the delay in obtaining review of Ralls' murder conviction by direct appeal to the Supreme Court of Connecticut,[4] we hold, on the totality of the facts and circumstances presented by the record before us, that this case does not present a clear denial of constitutional rights sufficient to justify federal intervention. Specifically, we hold that there is neither "an absence of available State corrective process [nor] the existence of circumstances rendering such process ineffective to protect the rights of the prisoner." § 2254(b) (last clause). The delay here in processing the direct appeal is not the equivalent of a complete absence of effective state appellate process[5] and therefore does not

---

2. Ralls has been represented in the federal habeas corpus proceedings by counsel other than his state appellate counsel; but his federal and state counsel have conferred together during the pendency of the habeas corpus proceedings, as we were informed at the oral argument of the instant appeal.

3. Ralls' counsel informed us at the oral argument of the instant appeal that these five substantive claims are essentially the same claims that Ralls intends to raise on his direct appeal to the Supreme Court of Connecticut.

4. We likewise deplore delays on direct appeals in criminal cases in other districts within this Circuit. E. g., United States ex rel. Mosher v. LaVallee, 491 F.2d 1346, 1347 n. 1 (2 Cir. 1974) (3½ years); United

States ex rel. Gibbs v. Zelker, 496 F.2d 991 (2 Cir. 1974) (5 years).

5. Indeed, the Supreme Court of Connecticut, in fixing the briefing and argument schedule in the instant case, State of Connecticut v. John W. Ralls, *supra* note 1, pointed out the remedies provided by Practice Book §§ 696 and 762 for expediting appeals:

"The rules contained in the Practice Book 'set forth the time period for each step in the appeal. Those periods govern unless there is good cause for modifying them. And the cause which is asserted to be a good one should be explicitly set forth in any motion for an extension filed under Practice Book § 655. The granting of such a motion in the trial court, however, in no wise affects the power of this court under § 696 to compel the expedi-

excuse the failure to exhaust state remedies.

We reverse the judgment of the District Court and dismiss the petition for a writ of habeas corpus.

LUMBARD, Circuit Judge (concurring):

I concur, but for reasons different from those stated in the court's per curiam opinion. The procedural history in this case shows not so much that the state prisoner has failed to exhaust his remedies but rather that the pursuit of those remedies has exhausted him. Were it not for the considerations which persuade me that the petition should be dismissed, I would think the petition raised very serious questions of due process because the enjoyment of the right to appeal has been so long delayed by action of the state and its judicial officers that the right has been nullified in large part.

This is another petition by a state prisoner who makes no pretense that he was innocent of the crime for which he was convicted—here the calculated murder of his mother-in-law—but who, nevertheless, seeks relief in the federal courts although the alleged defects which he claims occurred in the state proceedings relate only to evidentiary and procedural rulings which could not have affected the integrity of the finding of his guilt. After reviewing several thousand such petitions during 19 years on the federal bench, I have seen only two or three where a claim of innocence could be seriously advanced.[1] As I agree with all that Mr. Justice Powell, writing also for the Chief Justice and Mr. Justice Rehnquist, has so persuasively stated in his concurring opinion in Schneckloth v. Bustamonte, 412 U.S. 218, 250–275, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and what our colleague Judge Friendly has written, Is Innocence Irrelevant? Collateral Attacks on Criminal Judgments, 38 U.Chi.L.Rev. 142 (1970), I think the time has come to limit consideration of such petitions to those few, rare cases where there is a colorable claim of innocence and an alleged error of constitutional dimensions which goes to the integrity of the fact finding process.[2]

tious processing of appeals. . . . Under § 696, this court will, as occasion requires, make its own determination whether, from the time an appeal is filed, it is being prosecuted with proper diligence . . . . The work of this court is not expedited if counsel are permitted to dally for the purpose of bargaining with the opposition, for personal convenience or because other cases in hand are deemed by them to deserve preferential treatment.' . . . Chanosky v. City Building Supply Co., 152 Conn. 449, 451–52, 208 A.2d 337.

When any party to an appeal fails to prosecute or defend that appeal with proper diligence the other party, or this court on its own motion, may dismiss the appeal or set aside the judgment with costs. Practice Book § 696. Also, in the interest of expediting decision or for other good cause, this court may suspend the requirements or provisions of any of the rules on the application of a party or on its own motion and may order proceedings in accordance with its direction. Practice Book § 762.

Although these remedies have been available to the state and to each of the defend-

ants, it was not until this late date in the court year and on the eve of the court's adjournment for the summer recess that the state has sought the benefit of the provisions of § 762 of the Practice Book. We also note that neither defendant has ever sought the benefit of the provisions of either §§ 696 or 762 of the Practice Book, choosing instead to ignore the availability of relief under these sections and to proceed by way of writs of habeas corpus in the federal district court which has, nonetheless, assumed jurisdiction." (footnotes omitted).

1. One such rare case is United States ex rel. Cannon v. Montanye, 486 F.2d 263 (2d Cir. 1973).

2. See also M. Fleming, The Price of Perfect Justice 22–36 (1974); Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv.L.Rev. 441 (1963).

The Supreme Court has recently granted review in a case raising the question of whether a state prisoner who has pleaded guilty can raise a Fourth Amendment claim in a federal habeas corpus proceeding when state courts have reviewed the claim. Unit-

The uncontroverted proof produced by the state at the four-day trial showed beyond any doubt that Ralls killed his mother-in-law by firing four bullets into her body at close range.[3]

On Sunday, March 1, 1970, at about 1:00 or 1:30 in the afternoon, the body of a woman was discovered on the floor of a maroon Chevrolet parked behind the First National Store on Dixwell Avenue in Hamden, Connecticut. The woman, Barbara Howell, Ralls' mother-in-law, had died of multiple gunshot wounds in the head and chest from a .32 caliber automatic pistol. The time of death was estimated to be between 9:00 and 11:00 that morning. A search of the Chevrolet revealed three .32 caliber shell casings. The only identifiable fingerprint in the car, taken from the right vent window, was shown to be Ralls' thumbprint.

Ralls was separated from his wife Gwendolyn and lived at his parents' house with his three daughters. Benjamin Rawls,[4] Ralls' father, saw him leave the house in his black Oldsmobile around 9:30 on the morning of March first. He was going to the deceased's house to pick up some of his daughters' clothes that had been left there. He returned shortly before 10:00. Benjamin Rawls saw petitioner talking with the deceased and a third man near the deceased's automobile, the maroon Chevrolet. Rawls later saw his son drive away in the Chevrolet with Barbara Howell. Rawls said that his son returned to the house around 3:00 that afternoon and left again around 6:00 or 7:00 that night. Benjamin Rawls also had previously told the police he had found a .32 caliber bullet on the floor in his son's room a few days before March first.

Ada Rawls, petitioner's mother, testified that her son came home at about 5:00 on the morning of March first.

She told him to call his sister, who had received a letter to him from his wife. Ralls made the telephone call and was upset by the letter which was read to him. Ralls then went to his room to lie down. He got up around 9:00 and drove to Mrs. Howell's home to pick up the clothes, returned about 9:20 or 9:30 with the clothes, and left again. He came back about 3:00 that afternoon. Mrs. Rawls testified that she did not know about Ralls' feelings toward his mother-in-law, but she had previously told the police that Ralls had threatened to "get" his wife and mother-in-law.

Ralls' daughter Sharon, aged 8, testified that her sister Michell, aged 5, had laid a gun on the floor of their bedroom in the presence of her sister Jacquelyn and herself. Jacquelyn, aged 9, testified that her sister had said that morning that their father was going to hurt their grandmother, but that she asked him and he had said "no."

Gwendolyn Ralls, petitioner's wife, had left him in September 1969 after he had stabbed her in the leg. In May 1969 she had had Ralls arrested for aggravated assault when he hit her with a whiskey bottle. She also testified that petitioner had often threatened to kill her mother and herself.

Donald Rawls, the petitioner's brother, testified that on the two nights before March 1, his brother had shown him a gun, which his brother had said was a .32 caliber automatic. He also said that Ralls had told him that his wife would not live to see Monday, and that his mother had said that Ralls had told her that he would "get" both his wife and mother-in-law. Donald Rawls further testified that Ralls felt his mother-in-law had kept his wife from him.

Samuel Bowens testified that Ralls came to his apartment in West Haven on

ed States ex rel. Newsome v. Malcolm, 492 F.2d 1166 (2d Cir. 1974), cert. granted sub nom. Lefkowitz v. Newsome, 42 U.S.L.W. 3691 (June 17, 1974).

3. The parties, at the request of the court, filed supplemental briefs regarding the evi-

dence at trial as the original briefs gave no information about the proof. A supplemental record containing the state trial transcript has also been filed.

4. Petitioner spells his name "Ralls" while his parents and brother spell theirs "Rawls."

March 1 between 10:30 and 11:00. Ralls asked him to cash a $500 U.S. Chemical Company check. Since Ralls owed him money, Bowens gave him about $300 for the check. Ralls left at about 11:00. Bowens did not see any car driven by Ralls, but did recall that Ralls said nothing about his car breaking down or running out of gas.

In February 1970 Charles Cook worked with Ralls at the U.S. Chemical Company, where Ralls was a production manager. One day he saw Ralls take a gun, which Cook thought was an automatic, out of a paper bag. Also in February Donna Burkman, the office manager at U.S. Chemical, was told by Ralls that if he had had a gun "last night" he would have killed his mother, mother-in-law, and three children. He said that his mother-in-law interfered with his marriage. After the murder, on March 2 and 3, Burkman found that two payroll checks made out to Ralls in advance and five blank checks, as well as $80 in petty cash, were missing from the office. One of these checks was the check Bowens cashed.

Ralls was arrested on the afternoon of March 4. A search incident to arrest found the five checks taken from the U. S. Chemical Company. After being given the *Miranda* warnings and being booked, Ralls told detectives that on Saturday evening, February 28, his car broke down in front of a Dunkin' Donut Shop in West Haven. Hitchhiking, he was driven home by an unknown man. The next morning he started to walk to his mother-in-law's house, but was picked up and driven there by Jimmy Senior, a friend. Barbara Howell drove him home where they arrived at about 9:45. He had told her about his car running out of gas and asked her to take him to it. They first stopped at an Atlantic gas station on the corner of Goodrich Street and Shelton Avenue where he filled a gas can that was in her car. They arrived at his car between 10:15 and 10:30. He poured the gasoline into his car's tank from the can, started the car, and returned the can. Barbara Howell then drove away and that was the last he saw of her. Ralls explained that he went into hiding because he knew that he would be blamed when he heard of the murder on the evening of March first.

Several witnesses contradicted Ralls' account of his whereabouts. Jimmy Senior testified that he saw Ralls on March 1 between 10:30 and 11:00, walking in a direction away from Dixwell Avenue. Senior stopped his car and Ralls asked to be driven to his own car on Winchester Avenue, the street on which Barbara Howell lived. The ride took about three minutes.

To further contradict Ralls' story, a policeman from West Haven who was on duty the night of February 28 testified that there had been no complaints about a disabled car in front of the Dunkin' Donut shop. An employee who arrived at the donut shop early on the morning of March 1 testified that he saw no car parked where Ralls said he had left his car. Likewise, the manager of the carwash next door testified that he saw no car parked there that morning. In addition, the two attendants who were working at the gas station where Ralls said he and Barbara Howell had stopped, testified that they knew Ralls and had not sold him or anyone else that morning any gasoline in a gas can. Finally, no gas can was found in Barbara Howell's car.

Ralls presented no evidence in his defense.

Thus, it is not surprising to find that no serious claim is made that Ralls is innocent. Indeed, no such claim could be made as every circumstance points to him as the killer of Barbara Howell.

In any event, the two grounds upon which Judge Blumenfeld granted the writ fall short of being errors of constitutional dimension.[5]

5. In fairness to the district judge, however, it should be noted that he was probably hindered below, as we are on appeal, by the inexcusable refusal of the state to brief this

The first ground relied upon by the district court was the allegedly improper admission of the fact that Ralls had a prior criminal record. This occurred during the examination of the state police fingerprint expert who testified that he compared the print found in the maroon Chevrolet with a fingerprint card of Ralls on file in central bureau for all criminal arrest records in Connecticut. At this point the trial judge cautioned the jury that the prior arrest might have been a minor matter and it did not affect this case. The jury was then excused and Ralls' counsel moved for a mistrial, which was denied. When the jury returned, the trial judge again instructed them that they were not to take into account any prior arrest record and that the card could have been in the file because of a job application. The card itself was admitted into evidence.

The district court concluded that the admission of the fingerprint card was prejudicial error under the three-part test for admission of materials implying that defendant has a prior criminal record which we announced in United States v. Harrington, 490 F.2d 487 (2d Cir. 1973), and so violated Ralls' due process right to a fair trial. Even assuming that the district court correctly applied the *Harrington* standard, the problem with its conclusion is that *Harrington,* as well as the other cases it cited, was an instance of a federal court of appeals exercising its supervisory powers over the admission of evidence in the district courts. It goes without saying that in state prisoner habeas petitions the question is a very different one— whether the petitioner's right to a fair trial as guaranteed by the due process clause was violated. See, e.g., Jones v. Haskins, 459 F.2d 479 (6th Cir. 1972).

Here the record does not show that the admission of the fingerprint card deprived Ralls of due process. There was a legitimate purpose for introducing the card: showing how the witness had identified the fingerprint in the Chevrolet. The jury was not told what crimes Ralls was supposed to have committed previously and was carefully instructed by the trial judge. Finally, whatever prejudicial effect the admission of the fingerprint card had was vitiated by the later testimony, not objected to, by Ralls' wife that Ralls had been arrested in 1969 after she had charged him with aggravated assault.

In Spencer v. Texas, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967), the Supreme Court upheld a state procedure where the jury was told for purposes of sentencing under a recidivist statute the prior convictions of the defendant, but was carefully instructed that such convictions were not to be used in determining the guilt or innocence of the defendant. What the Court said in *Spencer* applies here as well:

> To say the United States Constitution is infringed simply because this type of evidence may be prejudicial and limiting instructions inadequate to vitiate prejudicial effects, would make inroads into this entire complex code of state criminal evidentiary law, and would threaten other large areas of trial jurisprudence.
>
> \*   \*   \*   \*   \*   \*
>
> Cases in this Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial. . . . But it has never been thought that such cases establish this Court as a rule-making organ for the promulgation of state rules of criminal procedure.

385 U.S. 562, 563–564, 87 S.Ct. 653–654.

The second ground on which the district court granted the writ was the al-

case on the merits. The state claims that to argue the merits of this case would somehow constitute a waiver of its claim that this case should not be heard because of Ralls' failure to exhaust state remedies. This stand overlooks the fact that the Federal Rules of Civil Procedure, which apply to habeas corpus proceedings, clearly allow defenses to be pleaded in the alternative. F.R.Civ.P. 8(e)(2). Thus, the state could have argued the merits here without waiving his exhaustion claim.

leged coercion of the jury by the trial judge. About two hours and forty-five minutes after the jury began its deliberations, the trial judge called them in because of the hour (5:00 p.m.). The judge told them that he was not trying to hurry them, but that he would like to know if they thought that sandwiches or a full dinner would be necessary. He then said, "I cannot allow you to leave before I have some sort of verdict. You could readily see, if somebody got sick overnight, I would have to declare a mistrial, and this case would have to start all over again. It would be an impossibility." He then asked if sandwiches would be enough. A juror told him that it would probably be quite a while before they came in with a verdict.

Later, at 8:07 the trial judge called in the jury and delivered the following instruction:

I sense that you must be having a little difficulty in reaching your verdict. However, as I have told you time and again, your verdict must be unanimous. It is true, of course, that a verdict to which each juror agrees, has got to be his own conclusion and not the mere acquiescence in or the conclusions of his fellows.

That does not mean that each juror should pursue his own deliberations and judgment with no regard for the arguments and conclusions of his fellows, or that having reached a conclusion, he or she should obstinately adhere to it without a conscientious effort to test its validity by the views entertained by the other jurors.

I am not telling you what to do. I am going to send you back in. Follow that theory, that you will resolve yourselves to do your duty and follow the thoughts of other jurors whom, I am sure, are equally as wise and have heard the same evidence. You may return to the jury room, and I hope it has shed some light. Thank you.

About an hour later the jury sent the judge a question asking if they alone determined whether the death penalty or life imprisonment should be imposed for a conviction of first degree murder. The judge answered affirmatively and ten minutes later the jury brought in a verdict of guilty of murder in the second degree.

The district court concluded that these supplemental instructions by the trial judge unconstitutionally compelled jurors voting for a minority position to acquiesce in the majority's position. The court first focused on the 5:00 p. m. statement where the judge told the jury that they had to reach a verdict. The court relied on the Supreme Court's brief opinion in Jenkins v. United States, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965), where a conviction was reversed on the ground that the district judge coerced a jury by telling them that they had to reach a verdict. But it should be noted once again that *Jenkins* was a case concerning a federal appellate court supervising the lower courts. Furthermore, the district judge had initially told the jury that the case was a simple one and should not detain them long. After two hours the jury sent back a note saying that it was hopelessly deadlocked. The district judge then said that he was not going to accept that and that the jury had to reach a decision. Jenkins v. United States, 117 U.S.App.D.C. 346, 330 F.2d 220, 221 & n. 2 (1964) (Wright, J., dissenting).

The situation in the instant case was very different. The remarks of the trial judge occurred in the course of an inquiry concerning whether it would be necessary to feed the jurors. Indeed, the judge's comments can be read as telling the jury that they could not go home once they had begun deliberations. Here, unlike *Jenkins*, the trial judge gave a further instruction three hours later.

The district court also found that the instructions given at 8:07 impermissibly coerced any jurors voting in the minority. While the trial judge's charge did not follow verbatim the charge in Allen v. United States, 164 U.S. 492, 501, 17

S.Ct. 154, 41 L.Ed. 528 (1896), which was derived from cases like State v. Smith, 49 Conn. 376 (1881), the question before us is not what the federal courts should do, but rather what due process requires state courts to do. The trial judge here clearly told the jurors that each juror must reach his own conclusion and not just acquiesce in the majority's verdict. The trial judge's comment to the jury to follow the thoughts of other jurors is not significantly more prejudicial than the *Allen* charge instruction that minority jurors should reconsider their opinions. See, e. g., United States v. Jennings, 471 F.2d 1310, 1313–1314 (2d Cir.), cert. denied, 411 U.S. 935 (1973); United States v. Kenner, 354 F.2d 780, 782–84 (2d Cir. 1965), cert. denied, 383 U.S. 958, 86 S. Ct. 1223, 16 L.Ed.2d 301 (1966).

In conclusion, such a charge seems to me to be well within the province of the state courts to pass upon in accordance with state practice in situations where the jury seems unable to agree. As the states may provide for convictions in criminal cases by less than unanimous verdict, Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972); Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), it would seem to follow that the means whereby unanimity is reached, including such a matter as a supplemental charge, is not to be judged by the standards which we apply in federal criminal trials where unanimity is a constitutional requirement. Thus the district judge was treading on territory which is better left for decision by our brethren of the state courts.

There being no reason whatever to doubt the guilt of the defendant, and little if any basis to believe that any rulings of the state court raise questions of such constitutional dimension as to justify federal court scrutiny and correction, the district court should have dismissed the petition.

At the same time it should be pointed out that in any case where guilt may be open to serious question [6] and where claims of constitutional dimension find a basis in the record, the federal district court need not stand by while the years pass and the state appellate process makes the speed of a snail seem spectacular by comparison. At the least, due process would require the defendants who must endure such an appeal be admitted to bail, lest they end by serving all or most of their sentence before the propriety of the conviction has been determined.

We understand that the Connecticut practice of making a finding is now under careful review. Apparently, the practice has been found to be a time-consuming expensive and altogether archaic practice which puts an unnecessary burden on counsel and the trial judge, and results in inordinate delay. Of course, it is not for the federal courts to devise rules for state practice. But if such rules play a part in the denial of constitutional rights, the fact that their use is tolerated would be no excuse for delays which might substantially diminish or nullify due process rights.

For the above reasons, the order of the district court should be reversed with directions to dismiss the petition.

---

**6.** I do not mean to suggest that a colorable claim of innocence is a necessary prerequisite in every habeas corpus case concerning a state prisoner, Judge Friendly in his article carefully delineates exceptions in which a claim of innocence is not needed. 38 U.Chi. L.Rev. at 151–53. Within his exceptions are claims that the state did not provide the type of trial the Constitution guarantees and claims that the state procedure has not allowed to be raised. Likewise, Mr. Justice Powell would allow federal habeas corpus review of a state prisoner's Fourth Amendment claims when the prisoner has not had a fair opportunity to raise the claims in the state courts and to have them adjudicated. See Schneckloth v. Bustamonte, *supra*, 412 U.S. at 250, 93 S.Ct. 2041; Cardwell v. Lewis, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed. 2d 325 (Powell, J., concurring in the result) (1974).

Here the claims are that Ralls did not receive the kind of trial that the Constitution requires but, as demonstrated above, this is not so.