Edward MALLEY, Jr.

v.

STATE OF CONNECTICUT and John Manson, Commissioner of Correction.

Civ. No. H–74–407.

United States District Court, D. Connecticut.

June 15, 1976.

**1116**

Thomas D. Clifford, Shipman & Goodwin, Hartford, Conn., for petitioner.

Jerrold H. Barnett, Asst. State's Atty., New Haven, Conn., for defendants.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

On November 24, 1970, the petitioner was convicted by a jury of one count of possessing a controlled drug (LSD),[1] and one count of selling the same drug.[2] On December 15, 1970, the trial court denied his motion to set aside the verdict and entered judgment.

---

1. In violation of Conn.Gen.Stat.Ann. § 19–481(b) (1969).

2. In violation of Conn.Gen.Stat.Ann. § 19–480(b) (1969).

Four years later the Connecticut Supreme Court affirmed the conviction, over the strong dissent of Justice Bogdanski.[3] *State v. Malley,* 167 Conn. 379, 355 A.2d 292 (1974). In this petition he challenges the constitutionality of his conviction and seeks a writ of habeas corpus. Jurisdiction exists under 28 U.S.C. §§ 2241 and 2254.

## I. *Facts*

The State's case was composed mainly of the testimony of two undercover agents, who testified that they had been approached by the petitioner, and that he offered to sell them some LSD. They testified that a short time later the sale was consummated, and that the substance, upon analysis, was conclusively identified as LSD.

The petitioner denied ever having seen the officers before, and presented evidence that he could not have been at the site of the sale at the time the officers stated it occurred. This alibi evidence consisted of the testimony of employees of a stereo store and an insurance agency, neither of whom were related to or acquainted with the petitioner, that he was present in one and then the other place of business at the times in question. The employee of the insurance agency was able to fix the time with some accuracy due to a specific phone call which he received while the petitioner was present.

The question for the jury, then, was essentially one of credibility. After seven hours of deliberation, and after having the testimony of one of the officers and the insurance company employee read to them, the jury determined the credibility issue against the petitioner and returned its verdict.

## II. *Petitioner's Claim*

The chief claim presented by the petitioner is that the conduct of the prosecutor throughout the trial, but especially in his closing argument to the jury, was so prejudicial as to have denied him a fair trial in violation of the due process clause of the fourteenth amendment. Additionally, petitioner claims that the prosecutor's references to irrelevant and inflammatory material in his rebuttal argument placed an impermissible burden on his exercise of his right to confront the witnesses against him.

Unfortunately, in order to convey the complete flavor of the argument employed by the prosecutor, it is necessary to quote at length from his rebuttal:

"Ladies and Gentlemen of the Jury:

"The basic issue I submit in this case is whether you believe the police officers or whether you believe this accused, Mr. Malley. The police officers have testified here before you. They have blown their cover. They come in here and testify before you, two excellent trained investigators, undercover men who, you heard their testimony, purchased over a hundred various items of heroin, LSD, and other controlled drugs. They have come in and we have lost them as undercover men due to this case, but we put them on here as witnesses before you, because this LSD problem and the sale of it is such a serious offense.

\*　　\*　　\*　　\*　　\*　　\*

"This question of the use of these psychedelic or hallucinagenic [*sic*] drugs has inflamed our country and has put many of us to asking questions about the use of this drug by our young people.

"We often hear the expression the drug scene. And when we think of the drug scene, we think of what we see on television, what we hear about, the group in Greenwich Village, young people dressed in hippie style using marijuana, LSD, speed, some one of these other drugs who turn on, but that is not the drug scene as we see it. That is not the drug scene as you have seen it here portrayed before you twelve people on this jury.

---

**3.** The four-year delay was not unusual. *See Ralls v. Manson,* 375 F.Supp. 1271 (D.Conn.), *rev'd,* 503 F.2d 491 (2d Cir. 1974). Fortunately for Mr. Malley, he was released on bond pend-

ing the outcome of the appeal process. He has remained free on bond pending the decision on this petition.

"What you have seen here is the sale of seven little tiny pills for $25, almost $3.60 apiece. That is a commercial business and it is designed to destroy the youth of our country and it is doing so. And it is carried on by men like Mr. Malley who sell indiscriminately, so indiscriminately that once in a while they make a mistake and they sell to two bearded, funny, easy to get along with fellows that drive around in an old car.

\* \* \* \* \* \*

"Now with respect to this drug scene, there are few people fighting it and a few of them are the two that testified here. There aren't many others, and we have lost them due to this trial.

\* \* \* \* \* \*

"Now, ladies and gentlemen of the jury, as Mr. Mellon says, you have a serious and solemn responsibility here to decide the guilt or innocence of this accused. You also have a serious responsibility to society for, as has been said many years ago, 'To let the guilty go free is to do thereafter with their hands all the crimes they may subsequently commit.'

"You ladies and gentlemen of the jury are aware of the problem in our society caused by drugs. This is your opportunity to return a verdict that reflects that concern. The State has submitted direct eyewitness evidence of police officers in respect to this man, and we respectfully suggest that the only verdict possible In [*sic*] this case is a verdict of guilty.

"Thank you." [4]

This argument built upon and was preceded by several incidents in which the prosecutor had attempted to explore the effect of LSD on users of the drug, especially minors.[5]

The question for this court is whether, by employing these arguments, the prosecutor effectively denied the petitioner his constitutional right to a fair trial.

### III. *Standard of Review*

At the outset, it is clear that both the questions asked by the prosecutor and his rebuttal argument, but especially the argument, transcended the bounds of propriety. Were this court exercising appellate review there is no question but that the prosecutor's inexcusable conduct would compel reversal. The Connecticut Supreme Court recognized as much when it stated that the prosecutor's comments were "improper and wholly irrelevant to the issue of the guilt or innocence of the defendant." *State v. Mal-*

---

4. Respondents' Ex. 7, at 25–27, 28, 31.

5. An example of this earlier questioning occurred while the petitioner himself was being cross-examined.

"Q And you told [your attorney] and told this jury that all you know about LSD is what you heard about it and seen on television?

"A Right.

"Q What you have read about it and seen on television?

"A Yes.

"Q You know it is a dangerous drug?

"A That is for sure.

"Q You know that it can cause permanent damage to people that use it, don't you?

"A I suppose it can. I wouldn't know. I never sampled it.

"Q You have read or seen it on television, haven't you?

"A Yes, I have.

"Q It is a so-called psychedelic drug?

"A Yes, it is, I imagine.

"Q People have good or bad trips on it?

"MR. MELLON: I will object to this.

"MR. McDONALD: Mr. Mellon went into it.

"THE COURT: I will allow it.

"MR. MELLON: May an exception be noted?

"THE COURT: Yes.

"MR. MELLON: For this reason: I don't think he is an expert to testify.

"THE COURT: If he doesn't know, he can say he doesn't know. He realizes that.

BY MR. McDONALD.

"Q You know that people can have bad trips on LSD. You have heard that.

"A I have seen it on television.

"Q And they can go off?

"A I have read different articles about it, where something like that happened.

"Q You wouldn't have anything to do with selling that to young people, would you?

"A I wouldn't sell it to anybody.

"Q You know it is deadly stuff, don't you?

"A It sure is."

Respondents' Ex. 6, at 185–86.

*ley,* 167 Conn. 379, 386, 355 A.2d 292, 296 (1974).[6] The standard of review which this court must apply is not, however, that of reversible error.

 It is established that misconduct on the part of the prosecutor can rise to the level of a constitutional deprivation. *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). In deciding whether the prosecutor's conduct during the course of this trial is a sufficient ground to support the issuance of a writ of habeas corpus, this court must determine if that conduct created "a situation so prejudicial to [the petitioner] that he was denied a fair trial within the meaning of the due process clause of the Fourteenth Amendment." *United States ex rel. Castillo v. Fay,* 350 F.2d 400, 401 (2d Cir. 1965), *cert. denied,* 382 U.S. 1019, 86 S.Ct. 637, 15 L.Ed.2d 533 (1966). The Supreme Court has cautioned that the proper standard of review in this type of case is

> " 'the narrow one of due process, and not the broad exercise of supervisory power that [it] would possess in regard to [its] own trial court.' We regard this observation as important for not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.' *Lisenba v. California,* 314 U.S. 219, 236, [62 S.Ct. 280, 290, 86 L.Ed. 166] (1941)."

*Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974).

This is not, however, a case, as was *Donnelly,* of one ambiguous comment made during the course of a long trial. Rather, the transcript discloses an effort on the part of the prosecutor to inflame the prejudices of the jury at every possible opportunity by: 1) introducing extraneous and irrelevant evidence concerning the effects of drugs on users, especially minors, and their

families; 2) intimating, without any evidentiary support, that the petitioner had been involved in a number of earlier drug transactions for which he had not been brought to justice; 3) inveighing against the "drug culture" and implying, again without evidentiary support, that the petitioner was in some way connected with it; and 4) attempting to bolster the agents' credibility with the unsupported assertion that the State had considered the case important enough to "sacrifice" the future ability of the agents to operate by "blowing their cover" and having them testify at the trial.

The prejudicial effect of linking a defendant to a plot to sell drugs to minors is self-evident. In *United States v. Bugros,* 304 F.2d 177 (2d Cir. 1962), the Second Circuit reversed a conviction because the prosecutor had raised the implication that the defendant had hidden narcotics where a child could easily have discovered them. In this case, however, the prosecutor went even further, stating that:

> "What you have seen here is the sale of seven little tiny pills . . . . That is a commercial business and it is designed to destroy the youth of our country and it is doing so. And it is carried on by men like Mr. Malley who sell indiscriminately . . . . "[7]

The prosecutor further prejudiced the case against the petitioner by implying that he had participated in previous sales of drugs, but had escaped punishment. In addition to the above quotation, which seemingly linked the petitioner to a broad conspiracy, the prosecutor continued:

> "But something went wrong with Mr. Malley this time because these men [the agents] came into Court and testified before you ladies and gentlemen of the jury. . . . "[8]

The combined effect of these two statements is clearly to imply to the jury that the prosecutor had personal knowledge of earlier transactions in which the petitioner

---

6. The court refused to rule on the issue however as there had been no contemporaneous objection at the trial. See Part IV, *infra.*

7. Respondents' Ex. 7, at 26.

8. *Id.* at 27.

had been involved, even though no such evidence had been introduced at trial.

The prosecutor went further and raised the spectre of "the drug scene," composed of "the group in Greenwich Village, young people dressed in hippie style using marijuana, LSD, speed, some one of these other drugs who turn on . . .." [9] While he told the jury that that was not "the drug scene" as it had been portrayed to them, he described the drug scene as they had seen it as a commercial business "designed to destroy the youth of our country." He then stated that two of the "few people" who were fighting against the drug scene (lumping the two "scenes" together) had been "lost" due to the trial. He finally invited the jury to return a verdict which reflected their concern with "the problem in our society caused by drugs." The obvious purpose of these remarks was to tell the jury that they could in some way strike out at "the drug scene" or stamp out "the drug problem" by convicting the petitioner. This tactic of associating a defendant with an unpopular or feared group and then inviting the jury to convict him as an exhibition of their feelings toward the group has moved courts in several instances to set aside the resulting verdicts. *United States ex rel. Haynes v. McKendrick,* 481 F.2d 152 (2d Cir. 1973) (appealing to racial prejudice); *Perry v. Mulligan,* 399 F.Supp. 1285 (D.N.J. 1975) (trial is of "all corrupt officials").

■■■ Such tactics violate the standards adopted by the American Bar Association Project on Standards for Criminal Justice, which state:

"¶ 5.8(c) The prosecutor should not use arguments calculated to inflame the passions or prejudice of the jury.

"¶ 5.8(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the prevailing law, or by making predictions of the consequences of the jury's verdict."

Standards Relating to the Prosecution Function and the Defense Function, Approved Draft (1971). Furthermore, they suggest a conscious attempt to prejudice the jury. In the opinion of this court the prosecutor's numerous remarks deprived the petitioner of a fair trial.

The prosecutor placed even a greater burden on the petitioner, however, by arguing to the jury that the State had in some way sacrificed the utility of the two undercover agents, and that they had been "lost" to the fight against "the drug scene." He argued that:

"They have come in and we have lost them as undercover men due to this case, but we put them on here as witnesses before you, because this LSD problem and the sale of it is such a serious offense." [10]

■■ The effect of this statement, which was repeated later in the argument, could only have been to further prejudice the jury against the petitioner, and to place an unfair burden upon his constitutional right to confront the witnesses against him. U.S. Const. amend. VI. This conduct was exacerbated by the absence of any evidence in the record to support such a statement. As Justice Bogdanski pointed out in his dissent, there were other, equally likely, possibilities which the petitioner could have explored through cross-examination, had the prosecutor presented any evidence to support this assertion. *State v. Malley,* 167 Conn. 379, 391, 355 A.2d 292 (1974).

While it is impossible to establish with certainty whether, but for the misconduct of the prosecutor, the jury would have returned a different verdict, it is possible to state that, on its merits, the case against the petitioner was a close one. The State's case consisted solely of the testimony of the two officers, and they disagreed on the critical issue of the time of the alleged sale, and were contradicted by their own report on their identification of the petitioner's automobile license number. On the other hand, the petitioner was able to marshal

---

**9.** *Id.* at 26.

**10.** *Id.* at 25.

impressive evidence on his own behalf. This is, then, one of the habeas petitions which raise, in addition to legal claims, substantial questions as to the guilt or innocence of the petitioner.[11] *See Kibbe v. Henderson,* 534 F.2d 493 (2d Cir. 1976); *Ralls v. Manson,* 503 F.2d 491, 494–99 (2d Cir. 1974) (Lumbard, J., concurring). The length of time the jury deliberated is only one indication of this.[12] In light of the seriousness of the misconduct, its repetition, and its likely effect on the jury, this court concludes that the petitioner was deprived of his right to a fair trial in violation of the due process clause of the fourteenth amendment.[13] *Cf. Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

## IV. *Waiver*

 A final difficulty is raised by the fact that the petitioner's attorney did not object to the prosecutor's closing argument.[14] It was because of this procedural default that the Connecticut Supreme Court refused to consider the petitioner's claim on appeal.[15] The court did hold, however, that the claim did not fall into the exception to its contemporaneous objection rule permitting review of errors which have deprived the appellant of a constitutional right and a fair trial. *State v. Malley,* 167 Conn. 379, 387–88, 355 A.2d 292 (1974). *But see* Justice Bogdanski's dissent, 167 Conn. 388–92, 355 A.2d 292.[16]

The question for this court, then, is not one of exhaustion since the claim was presented to the Connecticut court, but whether the petitioner can be held to have deliberately by-passed his right to object to the prosecutor's conduct and to renew his objections on appeal if the trial judge ruled against him. *Fay v. Noia,* 372 U.S. 391, 433, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).[17]

---

11. The petitioner has apparently submitted the result of a polygraph examination as an exhibit. This court has not examined the report and it has therefore played no part in its consideration. *See United States ex rel. Sadowy v. Fay,* 284 F.2d 426 (2d Cir. 1960), *cert. denied,* 365 U.S. 850, 81 S.Ct. 814, 5 L.Ed.2d 814 (1961); *State v. Mitchell,* Conn., 362 A.2d 808, 37 Conn.L.J. No. 3, at 6, 8 (July 15, 1975); *State v. Carnegie,* 158 Conn. 264, 272, 259 A.2d 628, *cert. denied,* 396 U.S. 992, 90 S.Ct. 488, 24 L.Ed.2d 455 (1969). This decision is based solely upon the transcript of the state court proceedings.

12. Compare the 12 hour total deliberation time in this case with the 15 hours held to be significant in the much more serious case of *Reilly v. State,* 32 Conn.Supp. 349, 361, 355 A.2d 324, (1976.)

13. The State argues that the prosecutor's misconduct was invited by the following statement made by the petitioner's attorney in his closing argument:

"I say I don't want to minimize the fact that narcotics is a big, big problem, and I can be assured that as soon as I sit down, I can only anticipate what the State's Attorney is going to try and bring out."
Respondents' Ex. 7, at 23–24.
Rather than an invitation, this was an attempt to parry the prosecutor's continuous attempts to try "the drug problem" rather than the defendant. *See United states v. Rubinson,* No. 75–1197 (2d Cir. Apr. 8, 1976).

14. The petitioner has also raised a claim of ineffective assistance of counsel. Since he admits that this claim has not been presented to the state courts, he has failed to meet the exhaustion requirement which has been interpreted into 28 U.S.C. § 2254. *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). This court therefore cannot consider this claim.

15. Connecticut Practice Book § 652 (1963). *Errors Considered*
"This court shall not be bound to consider any errors on an appeal unless they are specifically assigned or claimed and unless it appears on the record that the question was distinctly raised at the trial and was ruled upon and decided by the court adversely to the appellant's claim, or that it arose subsequent to the trial."

16. *Cf.,* although on direct review, *Norris v. Alabama,* 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935) and *Patterson v. Alabama,* 294 U.S. 600, 55 S.Ct. 575, 79 L.Ed. 1082 (1935).

17. The State's reliance on *Henry v. Mississippi,* 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965) is misplaced. The decision in *Henry* rested on a determination that the contemporaneous objection rule is an adequate and independent state-law ground of decision which precludes the Supreme Court's jurisdiction to directly review a state court decision. *See Fay v. Noia,* 372 U.S. at 429, 83 S.Ct. 822. Henry's state-court conviction was eventually set aside

The test of "deliberate by-pass" remains that set out in *Fay,* 372 U.S. at 439, 83 S.Ct. 849:

"The classic definition of waiver enunciated in *Johnson v. Zerbst,* 304 U.S. 458, 464 [58 S.Ct. 1019, 1023, 82 L.Ed. 1461]— 'an intentional relinquishment or abandonment of a known right or privilege'— furnishes the controlling standard. If a habeas applicant, after consultation with competent counsel or otherwise, understandingly and knowingly forewent the privilege of seeking to vindicate his federal claims in the state courts, whether for strategic, tactical, or any other reasons that can fairly be described as the deliberate by-passing of state procedures, then it is open to the federal court on habeas to deny him all relief if the state courts refused to entertain his federal claims on the merits . . .."

The record in this case, of course, shows no consultation between the petitioner and his counsel before the failure to object, or even a conscious decision on the part of either. And while it is true that some decisions in the heat of trial have to be made without prior consultation, it is inconceivable that any individual, having chosen to go to trial, could elect to waive his right to a fair one. *Cf. United States ex rel. Bruno v. Herold,* 408 F.2d 125 (2d Cir. 1969), *cert. denied,* 397 U.S. 957, 90 S.Ct. 947, 25 L.Ed.2d 141 (1970).[18]

But in this case it is, in fact, unnecessary to rely solely on a holding that there was no deliberate by-pass, since the Connecticut Supreme Court did in fact address the petitioner's constitutional claims on the merits,

at least to the extent that they are reviewable in this court.

As I stated above, the Connecticut Supreme Court recognizes two exceptions to its contemporaneous objection rule. The first is not relevant here. In passing on the second, the court held:

" 'The second "exceptional circumstance" may arise where the record adequately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right and a fair trial.' The record in the case before us does not disclose that the defendant has established the existence of either of the two 'exceptional circumstances' that would justify our consideration of claims not raised at the trial level."

*State v. Malley,* 167 Conn. 379, 387–88, 355 A.2d 292, 297 (1974).

■ Since the standard for the second "exceptional circumstance" is substantially identical to the standard this court has exercised in reviewing the prosecutorial misconduct, the State cannot now assert that the petitioner has waived this constitutional claim. *Warden v. Hayden,* 387 U.S. 294, 297 n. 3, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

### V. *Conclusion*

This court concludes that the repeated instances of prosecutorial misconduct, in which the prosecutor linked the defendant to unproven drug sales to minors, attempted to inflame the jury regarding the nature of the crime charged, and attempted to prejudice the jury against the petitioner because he chose to confront the witnesses against him, combined to deny the petition-

---

in a federal habeas proceeding. *Henry v. Williams,* 299 F.Supp. 36 (N.D.Miss.1969). *United States ex rel. Bruno v. Herold,* 408 F.2d 125 (2d Cir. 1969), *cert. denied,* 397 U.S. 957, 90 S.Ct. 947, 25 L.Ed.2d 141 (1970), is also distinguishable, since that decision was premised upon a finding that the petitioner was not deprived of a fair trial.

**18.** The two recent Supreme Court opinions, *Estelle v. Williams,* ——— U.S. ———, 96 S.Ct. 1691, 48 L.Ed.2d 126, (1976) and *Francis v. Henderson,* ——— U.S. ———, 96 S.Ct. 1708, 48 L.Ed.2d

149, (1976), do not require a different result. In *Francis* the Court held that statutory construction and comity considerations required the conclusion that Congress did not intend to include tardy challenges to the makeup of jury panels within the scope of § 2254. *Estelle* resulted from a determination that a defendant's failure to object to being tried in prison garb precludes the finding of compulsion necessary to constitute a constitutional deprivation. Neither case claimed to overrule *Fay v. Noia.*

er a fair trial, in violation of the due process clause of the fourteenth amendment. Accordingly the petition for a writ of habeas corpus will be granted unless the State elects to vacate the petitioner's conviction and retry him within sixty (60) days.

SO ORDERED.